MCKEE v. CITY OF GRAND RAPIDS.

1. WATERS—OBSTRUCTIONS—LACHES.

Where obstructions to the natural flow of water in a stream have been permitted to remain over 15 years, a riparian owner's remedy for their removal is barred by the statute of limitations and by laches.

2. EQUITY—INJUNCTION—ESTOPPEL.

One who makes a mere protest, and waits until an expensive improvement is completed, cannot invoke the aid of a court of equity to undo the expensive work.

3. SAME—RELIEF IMPRACTICABLE.

Equity will not grant relief which, under the evidence, is wholly impracticable.

4. WATER—RIPARIAN OWNERS—NUISANCE.

A city cannot divert water from one side of the river, to the injury of a riparian owner, into a channel on the opposite side, for the purpose of abating a nuisance in such channel, where there is another practicable way which will not damage landowners.

5. NUISANCE—PUBLIC HEALTH—PRIVATE INJURY.

A private person can only maintain a bill to abate a nuisance to the public health when the nuisance causes special damage to him as a private person, separate from that done to the public.

Appeal from superior court of Grand Rapids; Newnham, J. Submitted February 25, 1904. (Docket No. 53.) Decided July 16, 1904.

Bill by James H. McKee and others against the city of Grand Rapids to abate an alleged nuisance. From a decree dismissing the bill, complainants appeal. Affirmed.

The issues in this case are well stated in the opinion of the court below as follows:

"In the original bill of complaint it is claimed that the complainants J. H. McKee and James Landon McKee

are the owners in fee simple of certain property which adjoins the said steamboat channel, and that by virtue of their possessing the title to said premises they have riparian rights in said channel. The property which the said James H. McKee and James Landon McKee own is in what is known as 'Ellsworth's Addition to the City of Grand Rapids,' in blocks 23, 24, 25, and 26, the same being situated between the steamboat channel and the west side of what is now known as 'Market Street.' The complainant Albert M. Henry does not own any property in fee simple, but has interests in the said property to the extent of a contract made with the other complainants, whereby they were to convey to him an undivided one-fourth interest in said premises.

"The complainants also claim in the bill of complaint that what is known as 'Island No. 3,' and which is now known to the people of Grand Rapids as the 'Market Site,' was nothing but a sandbar or an island, which was often covered by the waters of said stream, and that they are entitled to the soil to the middle of Grand river, including portions of said Island No. 3.

"It is claimed that in 1832, and for many years thereafter, there was a channel about 200 feet in width between what is known as 'Island No. 3' and the easterly bank of the said steamboat channel, upon which said complainants' property abuts, and that this was the natural channel forming the means of navigating Grand river from below up past the premises of the said complainants; and they also allege that it is still a navigable stream, and that the same has been and still is used for the purpose of navigation.

"It is claimed that between what is known as 'Island No. 3' and what was then known as 'Island No. 5' there was a distinct channel, connecting this steamboat channel with Grand river, and that the flow of water was sufficient to cleanse the said channel, and to keep it free from all impurities; and that somewhere about 1871 certain parties caused a dam or embankment to be built connecting Island No. 2 with the east bank of said Grand river, thereby cutting off and diverting the flow of water which flowed through the east or steamboat channel, but that the said east channel, or said steamboat channel, still remained the deeper channel, and that it was still connected with the river by the open channel between Island No. 5 and Island No. 3.

"It is claimed also on the part of the complainants that about 1871 the said east channel was dredged near what was known as the 'head of the channel,' and also the foot of Island No. 5, and that a turning basin was made sufficient for the passage and accommodation of steamers plying upon said river; that in so dredging an embankment was made by the dirt which was thrown up, which partially cut off the flow of water through the said steamboat channel.

"It is also claimed that there was still an open channel between the two islands, which operated to prevent the stagnation of water in the so-called 'steamboat channel,' but that whatever benefit was derived from it was nullified by a trunk sewer which emptied into Grand river at the head of Island No. 5, and other sewers which emptied into the river; that the current carried the contents of these sewers down the east shore of the river, and through this steamboat channel; that about 1878 it is claimed by the complainants that the said city constructed a sluiceway, but that the nuisance still continued, and continued from that time on until 1897; that the flow of water through said sluiceway would have been sufficient to prevent the stagnation but for the pollution of said channel by the sewers aforesaid; that in 1897 the city of Grand Rapids purchased Island No. 3, and built a solid roadway of earth to said Island No. 3 across the head of said steamboat channel, and that it also filled up the northerly end of the turning basin of the steamboat channel with earth for a distance of 300 feet farther south than was necessary for the roadway; that this was done without the consent of the complainants; that this filling entirely shut off the flow of water from the westerly channel of Grand river into and through the steamboat channel, and that now the said channel is in such a condition that it is a menace to the public health, and that in consequence thereof the property of the said complainants has been rendered practically uninhabitable, and its use for business or residence purposes wholly prevented; that by the action of the city of Grand Rapids in cutting off the flow of water in said channel and polluting the waters thereof the use of said channel for the purpose of navigation has been impaired and destroyed; that the premises of the said complainants were suitable for the erection of docks and warehouses for the purposes of navigation and for the construction of business blocks and dwelling houses, and that the said

premises in consequence have been greatly lessened in rental value, and the sale of the same has been prevented, and that they have been damaged in the sum of $30,000; and the complainants ask for a decree of this court declaring the condition of said channel to be a nuisance, and that the said complainants are entitled to have said nuisance abated, and that the defendants may be required to remove the roadbed, the market site approach, and all obstructions between Islands No. 5 and No. 3, and to remove the earth, gravel, and other material which it is claimed has been dumped and deposited in said steamboat channel, and that it be required to reopen the said channel so as to permit and restore the flow of water of Grand river therein, not polluted with sewage; and that the defendant, as soon as the channel is opened, be restrained from further polluting the waters, by emptying its aforesaid sewers therein, and that an accounting be taken of the damages which complainants have suffered, and that a reasonable amount, not to exceed $30,000, be made to the complainants for the damages which they have sustained, and that the defendant be decreed to pay the same.

"Defendant, in its answer, denies many of the allegations of the bill, and states that Island No. 3 is the property of the city, and that it has complete title thereto; that the said channel filling, which was done in 1871, was done with the consent of the then holders of the property, through whom complainants derived their title; that they acquiesced and consented thereto, and that no objection was made prior to the filing of the bill.

" It denies that there was an open channel at the time of the city's purchase, or even prior thereto, that prevented the stagnation of waters, or that the sewage emptied above had any deleterious effect upon the waters of the channel, and that when said sewer was constructed at Fulton street, years ago, it was constructed without remonstrance on the part of the complainants; that Grand river has been used as a source of drainage by the city for 50 years and upwards; that the filling of the slip by the city made the channel no more objectionable than it was before, and that the channel at the foot of Island No. 3 has not been navigable for 10 years and upwards; that, if there was any pollution in 1896, and for some years before, it was such pollution as arose from water-closets on the east bank of said channel, some of which were owned by the complainants; that the city has not permitted any one to dump

anything into the steamboat channel that would be injurious to its waters, and defendant alleges that most of the property owners, outside of the complainants, in the vicinity, desire the steamboat channel to be filled; that the said steamboat channel is not now recognized as a navigable stream; that the navigation became less and less, and that now the same has practically been abandoned, to such an extent that the government of the United States has not required, in the bridge which is now being constructed across Grand river, to have a draw in any part except the main channel, or what is known as the west channel of Grand river."

After the original bill was filed the defendant commenced the erection of a bridge over the river at the foot of Wealthy avenue. Complainants then filed a supplemental bill, alleging that the defendant intended to make a solid fill at that point, and praying that the defendant be enjoined from filling said channel at that point, and that it be required to remove the earth and gravel which had already been dumped into the channel. Answer and replication were duly filed to the supplemental bill.

Upon the issues thus framed a large number of witnesses were sworn, whose testimony extends over 600 pages. Proofs were taken in open court, and the court made the following finding of facts:

"That prior to 1871 the so-called 'steamboat channel' was used more for navigation than what is known as the 'main channel;' that it extended along the east bank of the river for quite a distance beyond even the head of what is known as 'Island No. 5,' and which did lie to the north of Island No. 3; that in 1871 said channel was closed at the foot of Island No. 2 by a dam, which was constructed between that and the east bank of the river; that in that construction the city of Grand Rapids had no hand as a property owner, or in any other way; that the same was done without remonstrance on the part of any one, so that the only flow from Grand river through into the channel was through a small raceway between Island No. 5 and Island No. 3; that in 1878 the city, in order to make a larger flow, placed a sluiceway there, which remained until the filling by the city in 1897; that in 1895 the city bought what is known as 'Island No. 3,' and in

1897 filled up the head of the channel, so that there was no communication in any shape or way between the main body of Grand river and this channel in question.

"I find the facts to be, also, that for many years the navigation of Grand river had gradually lessened until about 1893, when it was practically abandoned, with the exception of occasionally a boat or two running for a very short time up and down the river; that said east channel was becoming of less and less importance as a navigable arm of Grand river, and that the same, for all practicable purposes, had been abandoned as far as navigation is concerned; that also the waters of the east channel, as they are at present, and as they have been for many years, by reason of its pollution and stagnation, have been a menace to the public health, and are a nuisance that should be abated.

"I find that the action of the city in filling up the head of the channel did not increase the nuisance over what existed before; that, on the other hand, from the evidence in the case, the nuisance was lessened, and that whatever pollution there is of the waters comes not from anything which is carried into it from above, but from the stagnation of the water, and the stuff and material which have been thrown into it by the adjacent property owners, and the excrements and drainings from the water-closets which have been situated on the bank.

"I find that the nuisance caused by the pollution of the water has existed from 1878 at least until 1897; for a period of over 15 years, during which time the city had no interest other than that of whatever supervision it had the right to have by virtue of its powers as a municipality.

"I find it to be a fact, from the evidence in the case, that the only way in which to abate the nuisance would be to entirely fill up the channel.

"I find the facts also to be that the said Island No. 3 has become very valuable property, in consequence of the improvements which have been made by the city of Grand Rapids since the purchase of the same, by the erection of valuable plants thereon, and the use of the said property as a market site for the city of Grand Rapids; that such action of the city has largely increased the value of the property.

"I find that the property of the said complainants is of more value at the present time than it was at the time that they purchased it; that the said property has not depreciated in rental value, or for the purpose of sale, in conse-

quence of the nuisance which it is alleged exists there, or through any action on the part of the city of Grand Rapids. There is no evidence in the case which shows that the complainants will ever derive any more rental or revenues from docks in use or to be erected, as the use of the river for navigation purposes has declined to such an extent as precludes any such idea."

In accordance with the above finding the court entered a decree the material parts of which are as follows:

"That the steamboat channel was filled across from the head of Island No. 3 by private parties, without the intervention of the defendant, about the year 1871. That with the exception of extremely high water, the only water flowing through the same subsequently thereto was through slips cut through private property over to the main channel of the river, one in 1878 and one in 1892, which were insufficient to materially affect the water within the channel. That the said east channel was at one time navigable, but gradually the use of it for such purposes became less and less to such an extent that practically for several years it has ceased to be a navigable body of water.

"That on account of the stagnation of the water, and the drainage from the shore, and more or less dumping, it has become, to a certain extent, a general nuisance. That the action of the city in filling up at the head of the channel in 1897, or thereabouts, did not increase the nuisance or objectionable character of the channel, but, on the other hand, tended to relieve the objectionable features of such channel, and improved the surrounding property. That the objectionable condition of the steamboat channel for a period of upwards of twenty years prior to the purchase of the island and the filling of the same at the head thereof has continued to exist, aside from the fact that it was relieved to a certain extent by the filling made by the city.

"That the improvements made by the city on Island No. 3 on the westerly side of the steamboat channel, and at the head thereof, have tended to increase and did increase the value of property in that vicinity, including the property of complainants, and the property of complainants has not depreciated in rental value for any reason of which complaint is made.

"That complainants stand upon the same footing as

other parties in the neighborhood, so far as any injury that may have been sustained on account of the condition of the waters of the steamboat channel, and they have not suffered any special injury different from that of the general public. That complainants were not damaged by the conduct of the defendant in any way. That the steamboat channel is not a navigable body of water in the ordinary sense of the term, and is a nuisance, the removal of which can only be done effectually by the filling of the same.

"It is therefore ordered, adjudged, and decreed that the original bill of complaint filed herein be, and the same is hereby, dismissed.

" It is further ordered, adjudged, and decreed that the defendant be and it is hereby required, in the construction of the bridge at Wealthy avenue, at the point of its crossing the steamboat channel, to so construct the same that there be left an open space in the steamboat channel at such point at least 10 feet above the surface of the water at ordinary stages, and of a width of 30 feet, temporarily; but no draw is required to be made therein.

" The decree of this court shall not be prejudicial to the right of the city to have the said steamboat channel declared a nuisance, and to abate the same by the filling thereof in the manner provided by law."

An understanding of the situation can perhaps better be obtained from the map hereto attached (p. 208).

*Burlingame, Belden & Orton* and *William E. Grove* (*Knappen, Kleinhans & Knappen*, of counsel), for complainants.

*Moses Taggart* (*Ganson Taggart* and *S. W. Barker*, of counsel), for defendant.

GRANT, J. (*after stating the facts*). The issues in this case are those of fact, rather than law. Counsel for complainants in their brief say :

" We assert that the city of Grand Rapids created and maintained this nuisance by emptying sewage at first directly into this channel, and afterwards by negligently permitting it to flow through the sluiceway into the channel; and also by the improper dumping of garbage and

filth along the bank of the channel. We also complain of its action in filling and causing or permitting to be filled in portions of the east channel, including the turning basin. If the defendant did not thus cause and create this nuisance, then complainants have no cause of action,

A, sluice from the steamboat channel to river.

B, Oak street fill of 1896.

C, C, sheds and restaurant.

D, filled turning basin.

E, the old dock torn away six or seven years ago.

F, F, F, part of the houses and closets on the bank.

H, few feet of dock of McKee's north of Wealthy avenue.

I, I, draws in railroad bridge and Wealthy avenue approved by the United States government. Crossing of channel at Wealthy avenue shows fill authorized by United States government.

and there is no necessity to discuss any abstract questions of law."

There are some issues of fact upon which the evidence is in conflict. Upon others there is a substantial agreement.

1. There were originally five islands in Grand river below the rapids. Islands numbered 1, 2, and 5 were above Island No. 3. Island No. 5 was called by the surveyors "Low Willow Isle." Their location can be seen upon a map found in the opinion in case of *Butler* v. *Railroad Co.*, 85 Mich., at page 252 (48 N. W. 569, 24 Am. St. Rep. 84). There was one well-defined natural channel east of these islands. About 31 or 32 years ago this channel between Islands Nos. 1 and 2 and the east bank of the river was filled with earth by the owners of the islands and the lands on the east bank. This filling completely closed that channel of the river, and a considerable portion of the business part of the city of Grand Rapids is built upon this land so made, and upon these islands. This, of course, prevented the flowage of water through the channel. For this the city was in no wise responsible. All remedy, either at law or in equity, for such action, is now barred by the statute of limitations and by laches. This action on the part of the property holders left no flowage of water from the main channel of the river into what is known as the "eastern channel," except that which flowed between Islands Nos. 3 and 5. There was little current between them except in cases of high water.

The court below found that this eastern channel had for more than 30 years been a nuisance. To this nuisance various parties contributed, as hereinafter stated. The action of the elements has also contributed to it by rains and floods, which washed the refuse deposited upon the surface of the lands adjoining into the channel. The fact, also, that the river is lower now in the summer than it was 25 or 30 years ago is another element increasing the nuisance.

In 1871 private parties interested in the use of the eastern channel as a waterway for commerce dredged the channel, and also dredged out a basin at the head of Island No. 3, so that boats coming up the channel could turn around. In constructing this basin the earth was excavated and thrown out, and an embankment made across the head of the channel. A small sluiceway, consisting of an iron pipe, was put in under the embankment for the purpose of admitting the water from above. The closing of the channel between Islands Nos. 1 and 2 and the main land and the erection of this embankment across the channel at the head of Island No. 3 substantially shut off all the current that would naturally flow from the main river into this channel. The water in the channel below naturally became stagnant. Complaints were made of noxious odors, and from that time, as appears by the records and proceedings of the common council, it has been a constant source of discussion, and various efforts have been made to abate the nuisance, which proved abortive. Various parties naturally made this channel a dumping ground, even against the orders and instructions of the city, and against notices posted along the channel banks.

Upon the complainants' property and other adjoining lands are situated some dwelling houses, in the rear of which, and near the bank of the channel, are water-closets or privies, which consist of a hole in the ground and boards upon the outside, with large cracks between. In times of high water some of these privies stand in the water. All agree that the general reputation of the neighborhood is bad. Garbage and slops were thrown out upon the ground, which would be washed into the channel by the rains. The seepage and flowage from these closets contributed to the nuisance. The boats which were used in the channel also were daily depositing offensive material.

The complainants desired, and the board of health advised, the construction of a sluice, instead of this small one, which was of little or no use; and in 1878 the city

constructed such sluice. It did not carry water at the low stages of the summer in sufficient quantities to remedy the evil. Much of the time it carried little, if any, water. It is claimed that the sewage from the sewer pipes above flowed down through this sluice into the channel, and contributed to the nuisance. We agree with the finding of the circuit judge that there was not sufficient offensive material which came through this sluice from the sewers to cause the nuisance. Other cities and villages above the defendant city also emptied their sewage into the river, and there is good reason for the testimony of one witness, who stated that there was no longer pure water in the river during the low stages. The sewers were emptied into the river at the usual distance from the bank. Finally, in order to remedy the evil, some of the sewers were carried out near the center of the river. Originally, some of the sewers emptied into the eastern channel, but this was some years ago, and there is no reason to believe that this contributes now to the nuisance. The floods in the spring and fall flushed this channel out sufficiently to carry with it all offensive matter. The trouble evidently is in the low stages of water in the summer, when stagnant water becomes unhealthful without the addition of offensive matter.

The city is not responsible for closing the channel between Islands Nos. 1 and 2 and the main land; neither is it responsible for the embankment at the head of the basin, which cut off all the current there was between Islands Nos. 3 and 5. We find no substantial foundation for the claim that the city has created the nuisance. If these complainants or their grantors desired to prevent these obstructions to the natural flow of water, they should have proceeded against those who caused them. Their remedy is now barred by the statute of limitations and by laches, no matter whether these obstructions were made by private parties or by the city.

We think the evidence fails to sustain the complainants' allegation that the city has deposited upon Island No. 3

garbage which contributed in any appreciable amount to the impurities of the water of the channel. The city constructed an incinerator, where it burns all its refuse which can be burned. The more offensive, which cannot well be burned, is taken to the foot of the island, and dumped into the main channel. If any offensive matter has occasionally been dumped into the channel, it has been against the express orders of the city. The city cannot be held liable for this entire nuisance, even if on a few occasions one of its employés has violated its instructions.

2. As against the city the complainants are not now entitled to the gracious writ of injunction to compel the city to undo what it has done. The purchase of the island, the intention to connect it with the main land and to close up the sluiceway, and the progress of all these important and extensive improvements were known to the complainants. They contented themselves with a mere protest at some stage of the proceedings. Two courses were then open to them: (1) To file a bill in equity to enjoin the work on the ground that it would increase the nuisance already existing, and cause them irreparable damages; (2) to wait until the work was done, and bring an action at law for damage. They waited. Equity will not now lend its aid to a party to compel an expensive work to be undone which the party might, by planting a bill in equity in reasonable season, have prevented. 16 Am. & Eng. Enc. Law (2d Ed.), pp. 356, 357; *Traphagen* v. *Mayor, etc., of Jersey City,* 29 N. J. Eq. 206; *City of Logansport* v. *Uhl,* 99 Ind. 531 (50 Am. Rep. 109); *Griffin* v. *Railroad,* 70 Ga. 164; 1 Spelling on Injunc. and Other Ext. Rem. § 26; *Edwards* v. *Mining Co.,* 38 Mich. 46 (31 Am. Rep. 301). See, also, *Clifton Iron Co.* v. *Dye,* 87 Ala. 468 (6 South. 192).

A mere protest under such circumstances will not open the door of equity to parties who thus delay in seeking its aid. 16 Am. & Eng. Enc. Law (2d Ed.), p. 357; *Easton* v. *Railroad Co.,* 24 N. J. Eq. 50; Kerr on Injunc. (4th Ed.) p. 138. When these complainants chose to content them-

selves with the simple protest, and then to stand by in silence, and see these extensive and valuable improvements progress, they estopped themselves to any remedy by injunction.

3. Another reason why the relief sought cannot be granted is that it is, under the evidence in this case, wholly impracticable. An engineer, one of the complainants' witnesses, testified that, to be effectual, the channel into the river should be as wide as the eastern channel, and as deep as the bed of the river. Another testified that pure water could only be obtained by running the channel into or near the middle of the main river. Whether sufficient water at low stages in the summer, when it is most needed, could be obtained, may be questionable. If it could what effect would such a channel have upon the volume of water in the river? To be effective, it must necessarily divert from the river more water than naturally ran through the original channel between Islands Nos. 3 and 5. The restoration of the sluice, or even the original channel, or their equivalent, would not abate the nuisance. It is not at all certain that the diversion of the volume of water necessary to abate the nuisance would not result in injury to the inhabitants on the west side. Has the city, or have the inhabitants on the east side, the right to divert the water to the injury of those upon the west side, even though the water so diverted would abate a nuisance to the health of the city upon the east side? This question must be answered in the negative; especially when, as herein shown, there is another sure and practicable way to abate the nuisance, and one which will not only cause no damage to the landowners, but will increase the value of their lands. All that the complainants, in any event, would be entitled to as against the city, would be the restoration of the volume and current of water equal to that which ran through the original sluice between Islands Nos. 3 and 5; and as against all would be entitled only to that which originally ran through the original channel between those islands. The question of abating the nuisance as a

menace to the public health is not now before us for discussion. Complainants, as a part of the general public, cannot maintain a suit upon that ground. Only when the nuisance causes special damage to a private person, separate and apart from that done to the public, can he maintain a suit to abate it. The city is not responsible for the embankment made in 1871, and cannot be compelled to remove it. The city did not thereby stop the flow of water. It cannot, therefore, be compelled to restore it. It can only be compelled, in any event, to restore what it took away. As the complainants desired, and as the board of health advised, the city undertook to increase the flow of water, not for the benefit of the defendant, but for the benefit of the public health. The experiment made in good faith by the advice of those upon whom the city had a right to rely proved a failure, and in 1896 the city closed it up; thereby, as is clearly established by the evidence, adding value to the complainants' lands. Even if the city were under any obligation to restore the channel, it is now, for the reasons above stated, impracticable and of doubtful propriety.

4. We agree with the conclusion reached by the court below that as a highway of commerce this eastern channel is now useless, and will ever remain so. There is not the remotest probability that the United States will ever dredge it out so as to make it a commercial channel, and certainly no private parties ever will, in view of the fact that the United States has now recognized the channel upon the west side of the island as the commercial channel; and if it ever improves any it will improve that. It has already recognized this channel by ordering draws in the bridges upon the west of the island, and refusing to require them over the eastern channel. Commerce and the general public will be as well accommodated on the west side of the island as they can be upon the east, and probably better. Not only would the channel itself have to be dredged to be useful for commercial purposes, but it would be necessary to divert the water of the river into it.

in sufficient quantities to purify it. No witness has expressed a belief that this will ever be done. It follows from what has been said above that the only practicable way to abate this nuisance is to fill the channel. Upon this there is also a substantial agreement of the witnesses. It is probably the only safe and effective way. Complainants' lands are already increased in value by the purchase of this island and the extensive improvements put upon it. It is unquestionable, and virtually admitted by the complainants themselves, that the filling of the channel will increase the value of their property, and add to it land which, under the present conditions, is of virtually no value. There is evidence that one of the complainants signed a petition to have this channel filled. Another testified as follows:

"*Q.* Don't you think, under the condition this property is in down there now, and with the present policy of the government not to have any draw in the east channel, that it would be worth more with the old channel filled up?

"*A.* There is no question about it at all.

"*Q.* Or that it would be worth more than it would be with any little artificial channel, such as existed at any time within the last thirty years?

"*A.* If things were returned, and a pure stream of water was flowing through there, I should rather have it in that shape than the present state and have to fill the land.

"*Q.* There was no pure stream of water flowing through this little artificial sluiceway from the river, was there?

"*A.* No, sir; but there should be.

"*Q.* I am speaking of it as it existed for the last thirty years. Taking into consideration the little artificial sluice that was there, the land is worth more filled up, now that the government has abandoned it as a navigable stream of water?

"*A.* I answered it two or three times that if it is to stay as it is now it is worthless.

"*Q.* If it stays as it was with that little channel that carried sewage into it, it is not worth much?.

"*A.* No, sir.

"*Q.* You have in contemplation a large channel through

there that would bring pure water, such as has not existed for thirty years?

"*A*. Not necessarily.

"*Q*. It would have to bring pure water to be of value?

"*A*. Yes, sir; but I don't think it would be a very large channel.

"*Q*. It would take a very different channel from any that was made by the city, wouldn't it?

"*A*. I am not an engineer. I could not say as to that."

We have already stated what the complainants' engineer testified to in regard to the channel. Under this state of facts the complainants' cause is without equity. If the present condition of the channel is a menace to the public health, the law provides a remedy for its abatement. With that question we, however, now have nothing to do. It is sufficient to say that for the reasons above stated the complainants are not entitled to any relief in equity. The bridge, as proposed by the decree, permits the passage of all the boats which now have occasion to use the channel. The defendant not having appealed, that decree stands, and the defendant can proceed with the construction of the bridge in accordance therewith.

The decree is affirmed, with costs.

The other Justices concurred.