MORRISON v. QUEEN CITY ELECTRIC LIGHT & POWER CO.

INJUNCTION—ESTOPPEL—WATERS AND WATERCOURSES—DAMS.
An injunction to restrain defendant power corporation
from overflowing the lands of defendant, who had made
no complaint against the erection of the proposed dam,
merely claiming greater damages than defendant was
willing to offer, and who furnished material for the con-
struction of the dam, was properly refused by the court
of first instance, on the ground that the proprietor of the
land was estopped by his conduct from objecting to the
use of the dam, and would be entitled to damages only.

Appeal from Grand Traverse; Mayne, J. Sub-
mitted June 2, 1914. (Docket No. 1.) Decided July
24, 1914.

Bill by Harvey Morrison against the Queen City
Electric Light & Power Company for an injunction.
From a decree for defendant, complainant appeals.
Affirmed.

*John W. Patchin, Parm C. Gilbert,* and *H. C. Davis,*
for complainant.

*Covell & Cross, W. P. Crotser,* and *Kleinhans &
Knappen,* for defendant.

KUHN, J. The bill of complaint in this cause was
filed to restrain the defendant corporation from over-
flowing certain lands owned by the complainant and lo-
cated upon the Boardman river near Traverse City,
Mich. These lands, it is alleged, were overflowed by
reason of the wrongful and unlawful construction of
a dam upon said river by the defendant corporation,
and consist of about 7½ acres, formerly owned by
Charles T. Cedersten and sold by him out of the
northwest corner of 40 acres to James M. Crandall.

Cedersten still owns the land to the east and south of the land in question. Crandall sold the property in 1909 to Sprague Pratt, who, on October 10, 1910, sold it to the complainant. After Crandall purchased the land he improved it for the purpose of carrying on milling operations, and at the time of the deeding of the property to Pratt there were located on the premises two dwelling houses and barn, a wood shed, an inclosed sawmill and a shingle mill, likewise inclosed. The deed of the land from Cedersten to Crandall was subject to certain water privileges granted by Cedersten in 1902 to Ralph Case, Joseph O. Crotser, and Lorraine K. Gibbs, which consisted of the right of certain water flowage and power and to hold back water and the natural flow of the same for a certain distance, specified in the deed as 40 rods, above a highway bridge which crosses the stream at the premises. This distance was measured and marked, while Crandall was in possession, by the placing of permanent monuments. These water rights were conveyed by Case and those interested with him to the defendant, the Queen City Electric Light & Power Company, in April, 1907. In the summer and fall of 1908 the defendant started the construction of a dam, and it was concluded that, in order to make it a profitable venture, it would be necessary to construct it with a 22-foot head. It was discovered, however, that if a dam with a 22-foot head were built it would be necessary to obtain flowage rights additional to those already possessed, and the matter of obtaining these rights was left to Mr. Crotser, who obtained such additional rights from certain of the riparian owners, and also attempted to obtain them from Mr. Crandall, who at that time was the owner of the property in question. Mr. Crotser testified as to his negotiations with Crandall, and stated that at the time he had negotiations with Cedersten before

building the dam he talked with Crandall and told him that the company was going to build a dam with a 22-foot head, which in all probability would cause certain flowage across his property; that they wished everybody to be satisfied, and requested him to fix a price for such rights; that Crandall made no objection to the building of the dam, but would not estimate his damages until the water was raised, and, relying upon this assurance, the company went on with the building of the dam; that he again talked with him in the spring of 1908, and again in the summer of 1908, about constructing the dam, and during the latter conversation said, "Jim, have you made up your mind yet how much you are going to charge us for the damage of flowage?" and Crandall said, "No." Again, in May, 1909, he met Crandall and asked him what he was going to charge for the additional flowage, and he replied: "A damned sight more than you paid for the first." He again talked with him in the fall of 1910, but at no time did Crandall protest against the construction of the dam.

Crandall admitted having had a conversation with Crotser and said:

"Joe Crotser asked me what I would take for any little additional damage they were doing to me—that was when he was negotiating with Mr. Cedersten about his property—and I told him I did not know anything about what the damage would be. I did not say until the dam was in. I said it would be a damned sight more than what he had paid; that is the very words I used, what he paid for the first damage. He wanted to raise it 3 feet. He said nothing about the additional damage. He said he wanted to raise it 3 feet more. He wanted 3 feet more of the head than the original right he had purchased. * * * I cannot tell at all what the time was. It was before the dam was built. I think it was.

"Q. He said that he was going to raise the water 3 feet higher than the 40-rod point from the bridge,

and that he wanted to settle with you for the right to do that?

"*A*. He told me he was going to raise it. He said that they wanted that right. * * *

"*Q*. You expected, Mr. Crandall, that they would pay you absolutely in full for whatever damage they did you by raising that water that extra 3 feet you spoke of, didn't you?

"*A*. I did not know what to expect when they didn't do it. I do not know whether I calculated to make them do it or not. Mr. Crotser did not offer to do it when he talked with me. He asked me what the damage would be, and I told him I did not know. * * *

"*Q*. But before you said in answer to that, didn't you, that they would pay you a damned sight more than they had in the first instance?

"*A*. That is what I said. Yes; for the first 40 rods. I told Joe that, and that night he told me that they wanted to raise that dam 3 feet higher than the original understanding, and that they got the right of way to the 40-rod point.

"*Q*. And you knew then that they contemplated building it 3 feet higher?

"*A*. How did I know what they were going to build? He said he wanted that right."

So much of the testimony has been set forth to show that Crandall understood that the defendant was going to raise the dam, and that he made no objection to its construction; the only question being the amount of damages which were to be awarded to him. Crandall was around the dam while it was being constructed nearly every day, and talked with the men engaged in the construction, and told the witness Matthews that he thought the 22-foot head would cause the flooding of his yard. He sold to the defendant eight or nine loads of lumber which went into the construction work, and took away pine butts, given to him by the company, which were removed in excavating for the dam. Complainant acquired the premises with full knowledge of these conditions.

After hearing the testimony, the chancellor denied injunctive relief, but further provided in the decree as follows:

"It is further ordered, adjudged and decreed that the complainant be given 30 days from the date of filing this decree within which to submit further proofs of the damages sustained by the complainant by reason of the construction and maintenance of defendant's dam, and the flooding of complainant's premises, as alleged in said bill of complaint, and that, upon application of either of the parties to said suit, a jury be impaneled and sworn to hear the proofs and to assess said damages."

This record is convincing that injunctive relief should not be given to the complainant. Relying upon Crandall's attitude during the construction of the dam, which justified the conclusion by the defendant that all he desired was adequate compensation for whatever damages the construction would cause him, the defendant made a large investment of money. The record demonstrates that the defendant was at all times willing to pay whatever Crandall's damages amounted to. Because he did not know the extent of his damages, Crandall insisted upon waiting to see what they would be before agreeing upon compensation. He stood by and saw valuable improvements made, and neither he nor his grantees can now obtain relief in equity to aid in their destruction. A general rule is laid down in 11 Am. & Eng. Enc. Law (2d Ed.), p. 428, and quoted in the opinion of this court in *Sheffield Car Co.* v. *Hydraulic Co.,* 171 Mich. 423, 450 (137 N. W. 305), where Mr. Justice STONE has reviewed some of the Michigan cases on the subject of estoppel:

"It may be stated as a general rule that if a person having a right, and seeing another person about to commit, or in the course of committing, an act infringing upon that right, stands by in such a manner as really to induce the person committing the act,

and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act. This, it has been said, is the proper sense of the term 'acquiescence,' which, in that sense, may be defined as acquiescence under such circumstances as that assent may be reasonably inferred from it, and is no more than an instance of the law of estoppel by words or conduct."

This rule finds support in the decisions of this court. See *Jacox* v. *Clark,* Walk. Ch. (Mich.) 249; *Payne* v. *Paddock,* Walk. Ch. (Mich.) 487; *Truesdail* v. *Ward,* 24 Mich. 117; *Blake* v. *Cornwell,* 65 Mich. 467 (32 N. W. 803); *McKee* v. *City of Grand Rapids,* 137 Mich. 200 (100 N. W. 580); *Stock* v. *City of Hillsdale,* 155 Mich. 375 (119 N. W. 435).

The decree will be affirmed, with costs to the defendant, but without prejudice to complainant to elect within 30 days, if he so desires, to resort to the court of law rather than to have a jury determine the question of damages in this cause.

MCALVAY, C. J., and BROOKE, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.