MORRISON v. QUEEN CITY ELECTRIC LIGHT & POWER CO.

1. WATERS AND WATERCOURSES — FLOWING LANDS — ACTION — EVIDENCE.

In an injunction suit to prohibit defendant from overflowing lands of the complainant, testimony that plaintiff paid $5,000 for the mill and premises including a claim for damages against the defendant power company would not be proof of the value of the premises when the transfer occurred.

2. SAME—DAMAGES—MINIMIZING INJURY.

The property owner whose lands are damaged by flowing is under the legal obligation to minimize the damage as far as may be and in an action for the injury can recover only the damages that could not be avoided by exercising reasonable precaution.[1]

3. SAME—DAMAGES IN CONTEMPLATION OF WRONGDOER.

Where defendant power company flooded the mill property of plaintiff, he was entitled to adequate damages for the injuries sustained and it was not material whether defendant actually contemplated them, as it must be held that all damages naturally and proximately following from its wrong were in the contemplation of the tort feasor.

4. SAME—DECREE—DAMAGES.

Award of damages of $235 increased by the court to $500 and decree modified accordingly.

Appeal from Grand Traverse; Mayne, J. Submitted October 5, 1916. (Docket No. 37.) Decided December 21, 1916.

Bill by Harvey Morrison against the Queen City Electric Light & Power Company for an injunction

---

[1] On duty of riparian proprietor whose rights are interfered with or one whose property is flooded because of the obstruction of a natural watercourse, to minimize the damages, see note in 22 L. R. A. (N. S.) 684.

restraining defendant from flooding complainant's land. From a decree awarding damages, complainant appeals. Modified and affirmed.

*John W. Patchin, Parm C. Gilbert*, and *H. C. Gilbert*, for complainant.

*Covell & Cross*, for defendant.

STONE, C. J. This case is before this court for the second time. The opinion written by Mr. Justice KUHN, when the case was first here, will be found reported in 181 Mich., at page 624 (148 N. W. 354). As his opinion gives a full and clear statement of the case, it is unnecessary to repeat it here at any length.

Briefly stated, the bill of complaint was filed to restrain the defendant from overflowing certain lands owned by the plaintiff, located on the Boardman river near Traverse City. These lands, it was alleged, were overflowed by reason of the wrongful and unlawful construction of a dam upon said river below the premises of the plaintiff, by the defendant. Plaintiff's premises consist of about 7½ acres of land 40 rods north and south by 30 rods east and west, in the west part of the southeast quarter of the southwest quarter of section 3, township 26 north, range 11 west. The lands had been sold by one Cedersten to James M. Crandall, subject to certain water privileges theretofore granted in 1902 to Ralph Case, Joseph O. Crotser, and Lorraine K. Gibbs, which consisted of the right of certain water flowage and power, and to hold back water and the natural flow of the same for a distance specified in the deed as 40 rods above a highway bridge which crosses the stream at the premises. These water rights were conveyed by Case and those interested with him to the defendant, in April, 1907. In the summer and fall of 1908, the defendant started the construction of a dam, and it was concluded that in

order to make it a profitable enterprise it would be necessary to construct it with a 22-foot head. It was soon discovered, however, that if a dam with a 22-foot head were built it would be necessary to obtain flowage rights additional to those already possessed; and additional rights from certain of the riparian owners were obtained. An attempt was made to obtain such rights from Mr. Crandall, who, at that time, was the owner of the property in question. It was claimed that Mr. Crandall made no objection to the building of the dam, but would not estimate his damages until the dam was completed, and the water raised. The defendant's dam and power house were completed about August 15, 1909.

We think it appears from the record that, while the plaintiff's premises consist of about 7½ acres, only about 4 acres of the same lie upon the east side of the river and are here affected; the portion west of the river being high land.

When the case was first heard in the court below, an injunction was denied; but the right was given to plaintiff to offer further proofs of the damage sustained by him by reason of the construction of defendant's dam and the flooding of the premises; and the right was given to either of the parties to impanel a jury to hear proofs and assess the damage. That decree, upon appeal, was affirmed by this court, but without prejudice to plaintiff to elect, if he so desired, to resort to a court of law rather than to have a jury determine the question of damages in the case. That opinion was handed down July 24, 1914. The case went back to the circuit court, and about one year thereafter, to wit, on July 14, 1915, the case came on to be heard before the trial court, to determine the question of damages which should be paid to the plaintiff by reason of the premises.

The plaintiff did not obtain a deed of these prem-

ises until December 7, 1910, that being the date of the acknowledgment of the deed from Sprague Pratt to him. His deed was recorded December 21, 1910. As early, however, as October 15, 1909, Crandall gave an option to Charles T. Cedersten granting him the right to purchase the property at any time within 60 days for the sum of $5,000. This option was obtained through Mr. Davis, and on October 16, 1909, the option was assigned to Sprague Pratt, a clerk in Mr. Davis' office. According to the testimony of the plaintiff, this option was obtained for him. Before even the date of the option the plaintiff examined the premises and talked with Mr. Crandall about the condition of the water. He testified that he was informed by Mr. Crandall that he could not run the mill any more, and that he would have to get out, and that Crandall informed him that the water had "put the mill out of business." He further testified that he went over the premises and saw just what the conditions were, and made up his mind that Crandall was right in what he told him about the flooding of the property and the impossibility of running it; that he saw that the water was there over the monuments which had been placed by Crandall, defining the original right of flowage. He further testified that Crandall told him that he had asked to have the water lowered, and it had not been done; that a suit would have to be commenced against defendant, and the water would have to be taken down before the mill could run; that he (Crandall) was fearful of his ability to force the matter through the courts, because he had the impression that his chances of losing were very great in court, and that he would not take it into court himself; that Crandall told him that he (Crandall) had presented the matter to the persons interested in the company and had wanted them to lower the water, and explained to them that he could not run unless it was lowered.

It appears, by stipulation in the original record, that on December 13, 1909, Pratt and Davis gave their demand note for $5,000, the proceeds of which were deposited in their account and drawn upon on the same date by check for $5,000 to James M. Crandall; that said note remained in the Traverse City State Bank until February 4, 1911, at which time it was paid by a demand note of the plaintiff for $4,000 dated February 4, 1911, and that an additional $1,000 note was given; and that said two notes of the plaintiff had never been renewed and were held by said Traverse City State Bank.

One cannot read the record in this case without becoming satisfied that the plaintiff never purchased the premises intending to operate the mills as a business; that he was employed by the Hannah & Lay Mercantile Company, and had been in such employ for more than 26 years, having charge of the books of account and the work generally of the office of the said company, and he also acted as its credit man; that he had handled some timber and forest products for himself in connection with the business of the company, but that he had never operated a mill himself, or engaged in the business as an operating proposition. We are satisfied that the whole arrangement which placed the title of this property in the plaintiff was manipulated by the officers and those interested in the Boardman River Electric Light & Power Company, a rival corporation, engaged in selling electricity in Traverse City, in competition with the defendant. In his testimony the plaintiff said:

"At the present time, the title to the Crandall mill, and the property where it stands, is in my name. I got the conveyance of that property by seeing Sprague Pratt. * * * I first mentioned the matter of negotiating or arranging to get this property to Mr. Clinch, and then to Mr. Garland."

Mr. Clinch was interested in the Boardman River Electric Light & Power Company, and Mr. Garland was cashier of the bank.

While the plaintiff may be considered as merely a "figurehead," or nominal owner of this property, yet the fact appears that he holds, and has held, the legal title to the property since December, 1910. Under these circumstances, we think he is entitled to such remedy as the law would give him and no more. *Edwards* v. *Mining Co.*, 38 Mich. 46 (31 Am. Rep. 301). But as the case is here on an appeal from a decree awarding damages to the plaintiff, the evidence must be examined with that end in view. Counsel for the respective parties were so far apart in their claims of what the evidence shows upon the subject of damages, that it became necessary for us to read the entire testimony in both records to enable us intelligently to pass upon that question.

We are satisfied that the premises were not worth the sum of $5,000 when purchased by the plaintiff; that he bought the same with his eyes open; knew the conditions; and, because he saw fit to purchase these premises and a lawsuit and promised to pay therefor the sum of $5,000, it does not necessarily follow that the sum which he paid must be taken as the value of the premises in the condition in which they were when he purchased.

Upon the same date that he recorded his deed, plaintiff caused to be served upon the defendant a lengthy written notice requiring it to absolutely desist and refrain from withholding the natural flow of the Boardman river, or to hold back the waters and the natural flow thereof in and to said stream at, and beyond the point located on said stream by the original conveyance from Cedersten by his deed to Case and others in 1902; and defendant was notified and re-

quired by the notice to conform strictly to its flowage rights. This notice was served December 21, 1910. It appears that defendant paid no attention to this notice. Plaintiff had a right to serve this notice and to ask defendant to desist from the further flooding of his premises. It ought to be presumed that any action found to be an invasion of another's rights will be discontinued. This invasion was not discontinued, and the bill in this case was filed February 14, 1911. The testimony to determine the damages, as we have said, was taken before the trial court in the month of July, 1915, nearly five years after this notice had been served upon the defendant.

What damages should this plaintiff recover for this claimed continued invasion of his rights after he became the owner of the property? There is a great conflict in the evidence as to the extent of the flowage and the amount of damages sustained by the plaintiff. We are satisfied that the premises have been damaged in a substantial manner, and that defendant has, without any right, raised the river along the premises of the plaintiff. L. K. Gibbs, one of the promoters of the defendant company, and a man as familiar with the Crandall property as any other witness who appeared in the case, testified as follows:

"We raised it just exactly to where it was showed to him (Crandall) on the start it would come to. We did know, after we got started to build the dam, that it would flood his property some, and it did; but at first we didn't know it. When we came to figure on a 22-foot head, we could realize it; that is when we got the levels correct."

The learned circuit judge, who heard the entire testimony, saw the witnesses, and visited and examined the premises, made a written finding in the case. We cannot better express his views than to here include his findings in the case, which are as follows:

"The only question involved in this case is the amount of damages to be awarded to complainant. Under the pleadings and proof complainant should be placed as nearly as possible in the same position he would have been had the water been raised only to the 40-rod limit.

"Complainant's premises are situate in the Boardman river valley. This valley, at the point in question, is a mile upwards in width and is situated between high lands on either side. Drillings on the premises and the level of the water in the cat-hole in Cedersten's field discolse the fact that the water level is higher in the field and in the holes drilled than in the pond. This somewhat anomalous fact, I think, may be accounted for on the theory that the passage of the water through the earth into Boardman river has been checked or interfered with by the raising of the water in the pond and by the deposit of silt and other matter in the bed of the river and on the sides of the bank below the water level. But, whatever the cause, the fact is established that the raising of the water above the 40-rod limit raised the water level in the cat-hole and on the premises.

"The raising of the water has interfered with complainant's business and has caused him damage. Complainant operated a sawmill and shingle mill upon the premises. These two mills were operated independently, and the business, also, was independent one of the other. It is admitted that the raising of the water did not interfere with the shingle mill or shingle business. It did, however, interfere with the sawmill as conducted by complainant. The sawmill was a cheaply constructed building consisting of frame with roof and part of the sides covered with sheet iron; the greater portion of the sides of the building was open. The machinery was placed upon timbers laid upon the ground. A description of the same appears in the testimony and need not be repeated. In operating the sawmill complainant made use of the sawdust as fuel. In our consideration of the same, we have assumed that complainant had a right to operate his plant as he deemed to his own best advantage. He evidently considered that the use of sawdust as fuel was an advantage.

"The damages should be predicated upon the use of the premises by complainant. Under the testimony the track could be raised and the sawmill operated to the same advantage for about $100. Some additional grading would have to be done, and we have estimated, under the evidence, that the sawmill could be changed so as to make use of the sawdust at an expense of not to exceed $125, and under the evidence this would not interfere with the manufacture of lumber nor add to the cost, as the raising of the water in the pond would place the mill and pond in relatively the same position as before.

"The witnesses varied materially upon the question as to whether the raising of the water was an advantage or disadvantage to the premises. Under the evidence, I find the fact to be clear that the value of the premises as a manufacturing proposition, the sawmill being raised as stated, is not affected materially by the raising of the water; the flow of the water from the cat-hole in Cedersten's field being provided for. In the spring of the year and during freshets, necessarily the water from melting snow or heavy rains must pass from Cedersten's field and the high lands adjoining over and across these premises. To accommodate this surface water, nature has provided a small ravine. The levels submitted show that this cat-hole can be readily drained into the river by an underground drain of tile or other material. My recollection is that $35 was the outside estimate of cost by witnesses as to the expense of this drain. In my opinion, $50 would be ample to drain this cat-hole. With the drain the water in the cellar of the boarding house would likewise be lowered. This would take care of all the water, also a considerable portion of the surface water in the spring, and in my opinion the premises would be in as good or better condition than before the raising of the water.

"The backing up of the water along the ditch beside the highway would render necessary a culvert or bridge; also, there is a possibility that some of the wagon tracks through the mill yard might require some gravel or other substance in the spring of the year. Although, in my opinion, the drain would make the premises as good as before the raising of the water,

the sum of $25 may be awarded to construct the culvert or bridge and for the small amount of gravel necessary to improve this track through the millyard.

"Complainant had deposited some sawlogs in the millyard. These logs are practically a total loss. Under the evidence complainant could have removed these logs to another mill at an expense of not to exceed $1 per thousand feet. Under the law it was his duty to lessen his loss by removing these logs. He will therefore be allowed $1 per thousand upon the logs, the cost of removal. The proofs show, however, that he might have manufactured these logs into lumber in the mill without any change, merely losing the supposed benefit of the sawdust as fuel.

"In my opinion, the changes in the mill as suggested and the draining of the water herein provided for, which will enable the complainant to make use of the sawdust as fuel, places complainant in the position that he can manufacture logs as cheaply now as before the raising of the water. For this reason, I do not allow any damages for loss of business. There is as much timber available as ever, and complainant can manufacture the same as cheaply as formerly. I therefore assess damages at the sum of $200, plus $1 per thousand for lost logs."

By the decree made in pursuance of this finding, the court awarded the plaintiff the sum of $253 damages for past, present, and future maintaining of the water in the Boardman river at and above the dam of the defendant at a head of 22 feet, and awarded execution therefor, with costs to the plaintiff. The plaintiff has appealed from that decree, and insists that he should recover, not only the original purchase price, but profits lost, both past and future, by reason of the conduct of the defendant.

It appears that the sawmill stood idle nearly all of the time of the pendency of this case. It has received little, if any, care, and naturally appeared to be in a dilapidated condition at the final hearing of this case. The plaintiff never attempted to operate the mill at all.

For some unexplained reason one year elapsed, after the former opinion in this cause went down, before the taking of any testimony upon the subject of damages. In the meantime, the property was deteriorating rapidly. It appears that the machinery in both the shingle and saw mills was secondhand machinery, when placed therein by Crandall; that the shingle mill was the more valuable; and that the latter was not affected by the raising of the water, except as the mill yard was rendered wet by the setting back of the water. It also appeared that the mills were operated independently of each other.

It is the contention of the defendant, and we think such contention is well grounded, that it was the duty of the plaintiff to minimize the damages which had been occasioned by the flooding of the premises, and that, having failed to do so, he can recover only such damages as would not have been avoided by so doing, and our attention is called to the familiar rule announced by this court in the cases of *Cubit* v. *O'Dett*, 51 Mich. 347 (16 N. W. 679); *Breen* v. *Hyde*, 130 Mich. 1 (89 N. W. 732); *Talley* v. *Courter*, 93 Mich. 473 (53 N. W. 621); and other similar cases.

It is also contended, and we think justly, that the plaintiff should have proceeded and made an honest endeavor to reduce the damages by changing and improving the property as suggested by the trial court, in its findings, and the doctrine is invoked: That a party is always entitled to recover the legitimate expenses incurred by him in an honest endeavor to reduce the damages flowing from, or following, a wrongful act. See *Ellis* v. *Hilton*, 78 Mich. 150 (43 N. W. 1048, 6 L. R. A. 454, 18 Am. St. Rep. 438); 13 Cyc. p. 78, and cases there cited. And, having failed to do so, plaintiff can only recover such damages as could not have been prevented by so doing.

It appears from the testimony that defendant paid

to two other parties, not more seriously affected than the plaintiff, the sum of $500 each, for flowage rights. The only doubt which we have had in this case is whether the sum awarded by the trial court was adequate to compensate the plaintiff for the damage which it may be said he had suffered since he became the owner of this property. We cannot lose sight of the fact that the defendant committed a tort in flooding the premises of the plaintiff. We think that the damages recovered should compensate for the injury sustained. The court should take a reasonable view of the question, realizing that the amount cannot be estimated with entire certainty, and should award the plaintiff adequate damages for the injury sustained under the circumstances here shown. It is immaterial whether the defendant actually contemplated the damages which resulted or not; it must be held to contemplate all the damages which legitimately follow from its wrongful act, bearing in mind the duty of the plaintiff to minimize his damages as above stated.

A careful examination of the entire record has led us to the conclusion that the amount of damages awarded by the trial court was inadequate. In our opinion, the millyard will, to a large extent, have to be filled in and raised, and much more drainage will have to be supplied than that contemplated by the trial court. We think that the amount of plaintiff's damages should be raised to $500, in lieu of the sum awarded him by the court below.

The decree will be modified in that respect, and when so modified will stand affirmed, with costs to the plaintiff, in both courts, to be taxed.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.