THOMPSON *v.* ENZ

OPINION OF THE COURT

1. WATERS AND WATER COURSES—DECLARATORY JUDGMENT—INJUNCTION.

> Defendants, having first obtained formal approval by all locally concerned governmental agencies and tacit at least approval by the Conservation Department of their preliminary plans for a canal dredging project, proceeded to invest so much in that project prior to commencement of a declaratory action and issuance of a circuit court's injunction as to render it inequitable now to forbid completion thereof.

2. ESTOPPEL—INJUNCTION—WATERS AND WATER COURSES.

> Facts make out a clear case for application of equitable rule of estoppel by conduct where defendants, prior to plaintiffs' request for and issuance of an injunction, had completed most of the excavation required for construction of canals on their plat, at very least 4,000 lineal feet of these canals were excavated to a depth suitable for small craft navigation; all the rest had been partly excavated; and all this was done with the knowledge of plaintiffs.

3. ESTOPPEL—ACQUIESCENCE—KNOWLEDGE.

> As a general rule, if a person having a right, and seeing another person about to commit some infringement upon that right, stands by in such a manner as to induce the person committing the act, and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act as assent may be inferred from his acquiescence and this is an instance of estoppel by words or conduct.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 6–8] 56 Am Jur, Waters § 340 *et seq.*
[3] 28 Am Jur 2d, Estoppel and Waiver §§ 31, 53, 55, 57.
[4, 9, 10] 50 Am Jur, Statutes §§ 60, 475.
[5] 27 Am Jur 2d, Equity §§ 102–117.
[11] 13 Am Jur 2d, Canals § 21.

4. EQUITY—JURISDICTION—STATUTES.
   A statutory policy, enacted and implemented during the pendency of an equity action, did not oust the court of jurisdiction previously and duly invoked; it did call upon the courts to aid in the enforcement of that policy wherever equity's maxims would permit such aid.

5. EQUITY—RELIEF.
   Equity may shape relief according to the situation as it may present itself when the time for decree arrives.

DISSENTING OPINION

T. G. KAVANAGH, J.

6. WATERS AND WATER COURSES—INJUNCTIONS—RIPARIAN RIGHTS—LAWFUL USE OF PROPERTY.
   *Defendants proposed use of their land is lawful and should not be enjoined, because the proposed use is not an illegal invasion of plaintiffs' property rights as riparian owners abutting Gun Lake.*

DISSENTING OPINION

T. E. BRENNAN, J.

7. WATERS AND WATER COURSES—INLAND LAKES—UNREASONABLE USE—CONFISCATION OF PROPERTY—COMPENSATION—CONSTITUTIONAL LAW.
   *Judgment declaring defendants' proposed development of their riparian property on a lake to be an unreasonable use was a gross injustice and an arbitrary, unlawful and unconstitutional confiscation of defendants' property without payment of compensation therefor, where the defendants did not propose to exercise any rights or inaugurate any uses which are in the slightest fashion more detrimental to the lake than the existing uses of other lake owners.*

8. WATERS AND WATER COURSES—INLAND LAKES—CANALS.
   *Defendants' excavation of canals on their property, which consists of 65 acres of land with 1,415 feet of frontage on a lake, was lawful when undertaken and it is lawful today.*

9. STATUTES—LEGISLATION—REGULATION—PROSPECTIVE APPLICATION.
   *Legislation and statutory regulation are prospective in their application.*

10. STATUTES — RETROACTIVE APPLICATION — INLAND LAKES AND
    STREAMS ACT — CONSTITUTIONAL LAW — VESTED RIGHTS.
    *Retroactive application of the Inland Lakes and Streams Act
    would constitute the unconstitutional deprivation of vested
    private property rights (MCLA § 281.731 et seq.).*

11. INJUNCTION—CANALS—DESTRUCTION OF PRIVATE PROPERTY—
    COMPENSATION.
    *Circuit court, by issuance of a mandatory injunction requiring
    defendant-landowners to fill in their canals, improperly ordered
    the destruction of private property without just compensation.*

Appeal from Barry, Richard Robinson, J., and from Court of Appeals prior to decision. Submitted January 8, 1971. (No. 15 January Term 1971, Docket No. 52,612.) Decided July 7, 1971. Rehearing denied August 27, 1971.

Complaint by Louis B. Thompson and others against Edward R. Enz, Robert E. Boyle, and Sunrise Shores, Inc., for declaratory judgment of rights in lands bordering on a lake. Michigan Department of Conservation intervened as a plaintiff. Judgment for plaintiffs. Defendants appeal. Ordered that new decretal judgment be submitted.

*Law, Buchen, Weather, Richardson & Dutcher,* for plaintiffs.

*N. A. Cobb* and *John M. Jereck,* for defendants.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jerome Maslowski* and *Patrick Kowaleski,* Assistant Attorneys General, for intervening plaintiff.

PER CURIAM. Refer to *Thompson* v. *Enz* (1967), 379 Mich 667.

Upon second review we are confronted by two intervenient facts of significant importance. One

has been established persuasively by testimony and exhibits taken and received since our opinions on first appeal were released and our subsequent order of April 3, 1968 was entered (for a copy of that order, see the appendix hereof). The other consists of enactment *pendente* of specific amendments of the Inland Lakes and Streams Act of 1965, No 291, effected by PA 1968, No 7.

The evidentiary fact to which allusion is made consists of controlling proof that the defendants, having first obtained formal approval by all locally concerned governmental agencies and tacit at least approval by the Conservation Department (now Department of Natural Resources) of their "Sunrise Shores" project,[1] proceeded to invest so much in that project prior to commencement of this declaratory action and issuance of the circuit court's injunction as to render it inequitable now to forbid completion thereof.

To demonstrate this precisely, attention is drawn to the plat of Sunrise Shores appearing on page 676 of our 379th report. Overhead photographs received in evidence upon remand disclose beyond dispute that the defendants, prior to request for and issuance of the circuit court's injunction, had completed most of the excavation required for construction of the canals, all being designated as "channel". At very least some 4,000 lineal feet of these canals were excavated to a depth suitable for small craft navigation. Nearly all the rest has been partly excavated. The partly excavated portions only,

---

[1] November 20, 1963 the in-charge officers of the Department wrote defendants as follows:
"We have examined the preliminary plans of
SUNSET SHORES
Yankee Springs Township
Barry County
and can see no reason for the final plans not being accepted, when submitted through the regular channels."

plus the remaining fastland between lots 13 and 76,
need only be dug to intended navigational depth in
order to connect Gun Lake with defendants' planned
artificial waterway. All this was done with the
knowledge of plaintiffs, defendants having met with
their respective representatives beforehand in ef-
fort to work out whatever objections were voiced at
the time. These facts make out a clear case for
application of the equitable rule presently quoted.

The project criticized by the individual plaintiffs
and by the plaintiff Department of Conservation
should have been challenged by complaint for in-
junction at very inception of dredging by defend-
ants, all such plaintiffs having been given precedent-
ly complete notice of defendants' purchase of their
riparian tract and of their plat-approved plan of its
development. In that connection we agree, now
that we have a factual record of testimony and com-
prehensive factual findings, that the project would
have been enjoinable originally as an unreasonable
use had the issue been framed and tried promptly
rather than subjected to the utterly amazing folly
of motion and counter-motion for summary judg-
ment and inevitable appeal; such practice being
contrary to the perfectly understandable rule this
Court has admonished so many times since release
of the equity action of *Culy* v. *Upham* (1903), 135
Mich 131, 135.

Equity's applicable rule is both sound and mature.
It is really one of estoppel by conduct; a rule which
the Court has applied on numerous occasions as may
be seen upon examination of *Morrison* v. *Queen City
Electric Light & Power Co.* (1914), 181 Mich 624,
628, 629, citing Michigan decisions to *Morrison's*
time.[2]

---

[2] For subsequent cases in which *Morrison's* doctrine of estoppel was
applied, see *Holcomb* v. *Alpena Power Co.* (1917), 198 Mich 165,

The Court observed in *Morrison* that "He [the plaintiff's predecessor in title] stood by and saw valuable improvements made, and neither he nor his grantees can now obtain relief in equity to aid in their destruction." The observation was made regarding the defendant's waterhead heightened dam of the Boardman River, and the consequent overflowing of a part of the plaintiff's upstream property. The rule quoted below was applied. We believe it applicable here.

"A general rule is laid down in 11 Am. & Eng. Enc. Law (2d Ed.), p 428, and quoted in the opinion of this court in *Sheffield Car Co.* v. *Hydraulic Co.* [1912], 171 Mich 423, 450 (137 N.W. 305), where Mr. Justice STONE has reviewed some of the Michigan cases on the subject of estoppel:

" 'It may be stated as a general rule that if a person having a right, and seeing another person about to commit, or in the course of committing, an act infringing upon that right, stands by in such a manner as really to induce the person committing the act, and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act. This, it has been said, is the proper sense of the term "acquiescence," which, in that sense, may be defined as acquiescence under such circumstances as that assent may be reasonably inferred from it, and is no more than an instance of the law of estoppel by words or conduct.' "

The mentioned amendments of 1968, referring first to new §§ 18 and 19, pertinently require that, before any dredging designed to extend or enlarge any artificial canal, channel, lake or "similar waterway" ("where the purpose is ultimate connection with an existing navigable stream" or lake) is

169, 170 and *Kiowiatkowski* v. *Duluth-Superior Dredging Co.* (1918), 201 Mich 251, 257.

undertaken, the person desiring so to proceed shall apply to the Department of Conservation for a permit authorizing the intended dredging. New § 20 provides for notice of the pendency of such an application and for a public hearing thereof upon written request. Then § 21 provides, for application in part to this case:

"Sec. 21. If the department finds that the project will not injure the public trust or interest, including fish and game habitat, that the project conforms to the requirements of laws for sanitation, and that no material injury to the rights of any riparian owners on any body of water affected will result, the department shall issue a permit authorizing the enlargement of the waterway affected. The department may impose such further conditions in the permit that it finds reasonably necessary to protect public health, safety, welfare, trust and interest, and to protect private rights and property."

*First:* A few months after our cited opinions of 1967 were released the legislature enacted PA 1968, No 7, amending PA 1965, No 291. Act No 7, however, was late by nearly four years after the equitable jurisdiction of the circuit court had been invoked by these plaintiffs, properly as four of us held when the action was here on review of grant by the Court of Appeals of *defendants'* motion for summary judgment (reversing the trial court's grant of *plaintiffs'* corresponding motion for hasty judgment). At that time there was no adequate remedy at law, or effective policy at law. That such a policy was enacted and implemented during pendency of the action did not oust the court of jurisdiction previously and duly invoked. It did call upon the courts to aid in the enforcement of that policy whenever equity's maxims would permit such aid. We look to performance of such aid,

believing that it is due from this seated Court of equity.

*Second:* That equity may shape her relief "according to the situation as it may present itself when the time for decree arrives" was definitely settled with the handing down of *Herpolsheimer* v. *A. B. Herpolsheimer Realty Co.* (1956), 344 Mich 657, 665 and *L'Hommedieu* v. *Smith* (1958), 351 Mich 223, 229. For the general rule, see 27 Am Jur 2d, Equity, p 818 (citing *L'Hommedieu* among other authorities):

"§ 249—*Granting of relief as of time of decree or close of trial.*

"While equitable *jurisdiction* is generally to be determined with reference to the situation existing at the time the suit is filed, the *relief* to be accorded by the decree is governed by the conditions which are shown to exist at the time of making thereof, and not by the circumstances attending the inception of the litigation. In making up the final decree in an equity suit the judge may rightly consider matters arising after suit was brought. Therefore, as a general rule, equity will administer such relief as the nature, rights, facts, and exigencies of the case demand at the close of the trial or at the time of the making of the decree." (Italics by text writer.)

. . . . . . . .

Counsel will prepare and submit to this Court for settlement a decretal judgment providing (among other things desired by counsel and approved by the Court):

(1) For approval of Judge Robinson's findings of fact as made on remand, but with declaration of decision not to apply them on account of estoppel of plaintiffs, the Conservation Department as well, to enjoin or seek to enjoin that which might once have been enjoinable.

(2) For vacation of Judge Robinson's judgment of August 22, 1969, to permit entry here of a new judgment.

(3) For confirmation as firm precedent of the "reasonable use" rule which Chief Justice T. M. KAVANAGH wrote for this case when it was here in 1967, whenever it is shown without intervening equity or equities that the rule should be applied according to its tenor and purpose.

(4) For issuance to the defendants by the plaintiff Department of a § 21 (of said Act No 7) permit authorizing the completion of defendants' mentioned project, in which the Department may "impose such further conditions in the permit that it finds reasonably necessary to protect public health, safety, welfare, trust and interest, and to protect private rights and property."

(5) For retention of jurisdiction of the cause by this Court for the purpose of securing prompt performance of the foregoing and for the determinative settlement of possible disputes that may arise either from the conditions imposed in the permit to be issued, or from the defendants' performance thereof.

T. M. KAVANAGH, C. J., and BLACK, ADAMS, SWAINSON and WILLIAMS, JJ., concurred.

## APPENDIX

(Order of remand with instructions issued April 3, 1968)

On order of the Court, the motion by defendants and appellees for an order amending and clarifying the order previously entered by this Court on December 4, 1967, is considered. It is hereby Ordered that the case be remanded to the trial court

for rehearing in accordance with the instructions contained in the opinion of Justice Kavanagh in 379 Mich 667.

O'Hara, J., dissenting.

Dethmers, C. J., abstained.

T. G. Kavanagh, J. (*dissenting*). When this matter was originally submitted to the Court of Appeals 2 Mich App 404 the only issue raised on appeal was whether the proposed use was an illegal invasion of plaintiffs' property rights as riparian owners abutting Gun Lake. In the view of the panel that considered the case it was not, and accordingly summary judgment was ordered for the defendants.

That decision was reversed on appeal to this Court and the case remanded to the trial court for trial.

Nothing has been added by this procedure or the trial court's findings of fact or conclusions of law which causes the writer to change the opinion formed the first time around when he was a member of the Court of Appeals panel.

The proposed use of defendants' land is lawful and should not be enjoined.

Herewith a vote to reverse and to dismiss.

T. E. Brennan, J. (*dissenting*). These litigants are not strangers to this Court. *Thompson* v. *Enz* (1967), 379 Mich 667, ended in three-sided indecision, which produced more years of litigation and the present revisitation.

A word about the former case. In 1967, our Court consisted of eight members. *Thompson* v.

*Enz* came before us on criss-cross motions for summary judgment, which resulted in a decision for the plaintiffs in the circuit court and for the defendants in the Court of Appeals. On hearing in the Supreme Court, Justices DETHMERS and KELLY agreed with the position of the plaintiffs and voted to reverse the Court of Appeals and affirm the judgment of the circuit court. Justices O'HARA and BRENNAN agreed with the defendants and voted to affirm the Court of Appeals. Justices T. M. KAVANAGH, SOURIS, BLACK and ADAMS disagreed with both plaintiffs and defendants. They did not think that either side should prevail on motion for summary judgment. They chose, in a phrase adopted by the other four members of the Court, "to remand this cause to circuit court for trial upon factual issues never alleged by the parties or framed by the pleadings * * * " which was " * * * to impose upon both plaintiffs and defendants an entirely new lawsuit, and one which neither side has asked for."

The clerk of the Court was confronted with the necessity of determining what result the Supreme Court had reached in its triangular opinions. The clerk counted noses for reversal of the Court of Appeals. He found Justices T. M. KAVANAGH, BLACK, SOURIS, ADAMS, DETHMERS and KELLY, a clear majority, all in agreement upon the proposition that the Court of Appeals should be reversed. He found no majority for a remand and new trial or for reversal of the trial court. He therefore concluded that the trial court's judgment for the plaintiffs had been affirmed by a divided court. Accordingly, the clerk entered an order reversing the decision of the Court of Appeals without any further statement.

In due course, as might well have been expected, the parties returned here to find out what had transpired. A motion requesting a more definitive order was filed. Had the matter been left as interpreted by the clerk, a very strange result would have prevailed. The trial court judgment would have been affirmed, a result espoused by only two members of an eight-member Court. Therefore, upon the application for clarification of its order, Justice T. E. Brennan, who had favored reversal of the trial court, joined with the four Justices who favored remand for a new trial.

And so a new trial, indeed a new lawsuit, ensued. That lawsuit was held under the strangest of ground rules. The trial court was instructed to make findings of facts as to the reasonableness of the use which the defendants proposed to make of their land, and in determining reasonableness, the opinion of Justice T. M. Kavanagh was to be the procedural text. It provided:

"First, attention should be given to the watercourse and its attributes, including its size, character and natural state. In determining the reasonableness of the use in the case at bar, it should be considered that Gun lake is not a large lake, that it is used primarily for recreational purposes, and that the defendants are changing its natural state by expanding the lake frontage of their property from an actual 1,415 feet to a total inclusive of the canals, of 12,415 feet, being an increase in frontage of approximately 800 per cent.

"Second, the trial court should examine the use itself as to its type, extent, necessity, effect on the quantity, quality and level of the water, and the purposes of the users. Factors in this particular case that should be considered include: (a) that this use would permanently add approximately one family without riparian rights to each 18 acres of

surface area (or 137 families); (b) the possibility
that the level of the lake may be reduced by with-
drawing trust waters into over 2 miles of the
proposed canals, as is alleged by the attorney gen-
eral in his motion to intervene; (c) the possibility
that pollution may result; (d) that there is nothing
in the record showing any necessity for this use;
and (e) the fact that it appears that the purpose
of the defendants herein is merely commercial
exploitation.

"Third, it is necessary to examine the proposed
artificial use in relation to the consequential effects,
including the benefits obtained and the detriment
suffered, on the correlative rights and interests of
other riparian proprietors and also on the interests
of the State, including fishing, navigation, and con-
servation. An additional fact to be considered by
the trial court in this litigation is whether the bene-
fit to the defendant subdividers would amount
merely to a rich financial harvest, while the remain-
ing proprietors—who now possess a tranquil retreat
from everyday living—would be forced to endure
the annoyances which would come from an enor-
mous increase in lake users." *Thompson* v. *Enz*
(1967), 379 Mich 667.

These factors could hardly be called objective
standards by which the reasonableness of the use
could be determined. It is not unfair to say that
these factors were merely argumentative sugges-
tions as to the type of factfinding which would
support a decision for the plaintiffs. In short, the
so-called decisional factors were an obvious expres-
sion of the disappointment of the Justices who
signed that opinion over the fact that the plaintiffs
had chosen to present their claim as a matter of law
and submit the controlling legal question *via* the
device of a motion for summary judgment.

In spite of all this help from the Supreme Court, the trial judge, in an exemplary display of objectivity, made findings of fact which ignored as appropriately irrelevant most of the argumentative considerations contained in the opinion for remand. His findings of facts and his opinion are as follows:

"1. Gun Lake is a recreational body of water with a highly irregular shoreline producing a circumference of 17.2 miles which encloses 2672 acres of water. A lake with a regular shoreline and elliptical in shape would enclose the same amount of water in 8.5 miles of shoreline.

"2. The lake is shallower than the average lake of its size.

"3. Channeling in previous years, principally for residential development has added 6.4 miles of shoreline (counting both sides of the channels) and 36 acres of water to the lake.

"4. Defendants own 65 acres of land with 1415 feet of frontage on the lake which they propose to ultimately develop into approximately 143 lots, of which 130 will have frontage on artificial canals. Thirteen of the lots have frontage on Gun Lake and are included in the initial plat of 41 lots. This plat has already been approved by various state agencies under the prior plat act.

"5. Access to defendants' back lots, both those to be platted and those presently platted will be by way of canals (two have been dredged and await connecting to each other by a third yet to be dredged) which connect with Gun Lake through an 80 foot wide opening between lots 13 and 76 of the present plat (known as Sunrise Shores).

"6. Defendants' proposed development would add 12,200 feet or 2.3 miles of frontage to the lake

shoreline (Counting both sides of their proposed channels).

"7. Practically all of the present natural shoreline of the lake is now developed.

"8. The bulk of the present development is composed of single cottages strung out along the shoreline one tier deep. In some areas the development is two tiers deep, and in Johncock's development four tiers deep. Defendants' proposed development is eight tiers deep.

"9. From twenty to twenty-eight per cent of the dwellings on the lake are year-round.

"10. There are twelve commercial uses on Gun Lake and two public parks (Allegan County Park and the State owned Yankee Springs recreation areas).

"11. In the past ten or twelve years there has been a substantial increase in the number, size and horsepower of boats on the lake.

"12. The most active season on Gun Lake is from the middle of June to the middle of September. During this season, the most active days are weekends and holidays. The most active hours are from 10:00 a.m. to 7:00 p.m.

"13. On a peak day the population in the Allegan County Park approximates 300 with about twenty-five boats launched per peak day.

"14. During the busy season 200 campers daily use the Yankee Springs Camp Site. On each weekend day up to 22,000 people use the beach, picnic and boat launch facilities. On these days up to 200 boats are launched per day. The State Park has 3 1/2 miles of shoreline which amounts to a boat for each 90 feet of shoreline on a peak day.

"15. There are some 2,000 to 3,000 boats on Gun Lake on a given peak day of which 250 will be in use

at any one time. This is one boat for every ten acres of water.

"16. The number of boats on Gun Lake average 1 1/2 per dwelling.

"17. When boat use density approaches one boat for each ten acres of water, quality of boating diminishes and boaters tend to become discouraged and some will leave.

"18. Defendants' proposed development when completed will add 21 boats per day to the boating use of Gun Lake or 9% increase in boat traffic.

"19. Channel residents are more likely to use the lake than are typical back-lot residents because it is easier to untie a water borne boat than to trailer one to the lake and launch it.

"20. An increase in boat traffic will tend to eliminate the desirable type of aquatic growth that certain fish need for survival.

"21. The quality of fishing in Gun Lake is still good.

"22. Twelve years ago one could fish, boat and ski in safety at any hour of any day. Today these activities must be restricted to less active hours and less active areas of the lake.

"23. It is difficult to fish on the lake after 10 a.m. and before 7 p.m. It appears however that the best fishing hours in the absence of congestion appear to be before 10 a.m. and after 7 p.m.

"24. Water skiing becomes hazardous during the hours of peak activity.

"25. Between 10 a.m. and 7 p.m. during the fishing season it is unsafe to be on the lake in a small fishing boat (of 14 feet and under).

"26. As a general proposition when boat traffic decreases for an extended period of time fishing quality returns.

"27. No swimming beach is reserved for use of the residents of the proposed back lots in Defendants subdivision.

"28. Defendants proposed channel would not lower the present level of Gun Lake.

"29. Water quality in Gun Lake today is good.

"30. The underlying soil in Defendants' proposed subdivision is peat and organic material which will not support a proper septic tank operation. This could be corrected by removing the underlying soil and refilling with sand although the expense might be prohibitive.

"31. The minimum depth of the water table below the ground surface for adequate septic tank operation is five feet.

"32. The water table in Defendants' proposed subdivision is too close to the ground surface to support septic tank operation. The water table in this area varies from thirteen inches below ground surface to four feet below.

"33. The proposed lot sizes in Defendants' proposed subdivision are in any [*sic*] instances less than the required minimum for adequate septic tank operation. This could be corrected by making fewer and larger lots.

"34. A central sewage disposal system would operate effectively in the subdivision because it would remove all the sewage from the area without any seepage through the ground. No central sewage disposal system has been incorporated in Defendants' proposed subdivision.

"35. No central sewage disposal system serves any of the Gun Lake area, all disposal being by means of individual septic tanks, except in the State Park which is served by a lagoon type system.

"36. Septic tanks are all right for seasonal use

in a sparsely populated area but not in area of dense population. Any in-depth development using private septic tanks for sewage disposal represents a direct threat to the lake.

"37. In the existing channels developed around Gun Lake the water is of good quality although the phosphate content is such as will produce algae.

"38. Gun Lake is a marl bottom lake. Marl tends to retard growth of algae which are injurious to aquatic life by trapping the nitrate phosphates upon which such algae plant life feeds.

"39. There are approximately 1,000 property owners around Gun Lake and each dwelling puts nutrients into the lake through septic tank drain-off.

"40. Much septic tank seepage is composed of soluble nutrients which are carried underground into the lake. Nutrients in water reduce its quality for recreational purposes.

"41. Effluents from septic tanks in a channel development have direct access to the lake by means of the channels.

"42. Nutrients produced by marl flow into Gun Lake from three sources:

    1. Septic Tanks
    2. Urban run-off
    3. Rural run-off

By far the largest source is septic tanks around the lake.

"43. Open shorelines where currents move more readily carry away septic tank seepage than do channels where limited movement of water tends to concentrate seepage and permit it to be more readily taken up by plants.

"44. We can expect to find nuisance bloom (algae) in every canal eventually including the State Canal.

"45. Phosphates from septic tanks can eventually no longer be trapped by the marl as they tend to add their decaying weed growths to the bottom and from this point on aquatic growth will multiply.

"46. When the algae-retarding qualities of the marl in Gun Lake have been overcome by nutrients, the lake will become a nuisance lake. This can only be stopped by restricting the nutrients in great quantity from running into the lake.

### "OPINION

"It appears that Gun Lake has been and still is today, a beautiful recreational lake, although now somewhat congested. Water quality is still good and fishing is still good when one doesn't have to compete with the higher powered boats. Boating is hazardous at times of peak activity, and any increase in boating activity will undoubtedly cause a deterioration in quality of boating.

"Each dwelling around the lake is a contributor of pollutants going into the lake—primarily through their septic tanks. To date the lake has been able to cope with this and still maintain a relatively high level of good quality water. The bulk of the evidence presented to the Court, however, indicates that the lake's tolerance level may have been reached and that any substantial increase will start the lake down the road toward becoming a nuisance lake—a process which is difficult if not impossible to reverse.

"This may happen as the present undeveloped shoreline is developed, although the quantity of this is limited. In any event, nothing can be done to stop this if done in single tier construction.

"Certainly Defendants' proposal, for the sole purpose of economic gain, to cast an additional nine to ten per cent traffic and pollution burden on the lake

from a shoreline which comprises only one and one-half per cent of the total is unreasonable.

"Defendants contend that Plaintiffs and others are contributing their share to the congestion and to the pollution, and that what is proper for them is proper for the defendants. The answer to this is that the others were there before the breaking point was reached. Whether or not owners such as the state, who put large numbers of people onto the lake will eventually reach the point where they burden the lake out of proportion to their frontage and will have to be restricted in their activity is not before the Court at this time. Boating wise, the state with 3 1/2 miles of shoreline, does not now appear to be casting an unreasonable burden on the lake (in other words on the other riparian owners).

"No attempt will be made to answer defendants' argument which says, in effect, that by approving defendants' plat the state is now estopped to oppose their development. The initial plaintiffs are private property owners and the state is only an intervening party whose conduct, if subject to the defense of estoppel, is not chargeable to the private plaintiffs.

"A judgment may enter declaring defendants' proposed development to be an unreasonable use.

"Such judgment shall delineate the relief to be granted after hearing to be held on August 1, 1969 at 10:00 o'clock in the forenoon, pursuant to GCR 521.6.

"Dated: July 7, 1969.

> (s) Richard Robinson
> Circuit Judge"

We do not believe that a great deal of analysis needs to be addressed to the trial court's findings and opinion. The trial court found "that the lake's tolerance level may have been reached." He con-

cedes that any further development of the undeveloped shoreline may "start the lake down the road toward becoming a nuisance lake." The trial judge then says "In any event, nothing can be done to stop this if done in single tier construction." We cannot but ponder why the circuit judge arrived at this conclusion. Was the circuit judge recognizing a Fourteenth Amendment protected property right to build cottages in a single tier along the undeveloped shoreline? In this conclusion, we would certainly concur. But if the defendants' right to use their property in any lawful manner and to exercise their riparian rights in the same fashion as the other riparian owners is a right of property protected by the Fourteenth Amendment to the Federal Constitution, we fail to see why it would be arbitrarily limited to a single tier development of lake front cottages.

In the trial of this case, exhibits were introduced which depict the numerous existing canal developments on Gun Lake. The trial court found that the existing canal developments represent 6.4 miles of canal frontage and that the defendants' proposed development would add 2.3 miles of canal frontage to the lake. Our computation of the actual lake frontage of all the existing canal developments taken together is approximately 4,800 feet. Thus the ratio of canal frontage to lake frontage of the defendants' development is approximately the same as the ratio of all the previous canal developments taken in combination. Even the most cursory review of the exhibits discloses that many of the previous canal developments show canal frontage to lake frontage ratios substantially greater than that sought by the defendants.

All of which is pointed out merely as a means of emphasizing the plain and obvious truth of this case, and the gross injustice of the result arrived at in the trial court. These defendants do not propose to exercise any rights or inaugurate any uses which are in the slightest fashion more detrimental to the lake than the existing uses of other lake owners. In fact all necessary permits were obtained, fees paid and approval granted to proceed with this development. The trial court would brand these defendants' use as the "straw that broke the camel's back," and in the name of preserving to these plaintiffs a quasi-monopoly to use a lake which belongs to the people of Michigan, our Court would approve the arbitrary, unlawful and unconstitutional confiscation of the defendants' property without payment of compensation therefor. The defendants have excavated canals on their own property. That excavation was lawful and, in fact, authorized when undertaken. It is lawful today.

The legislature by PA 1968, No 7, provided:

"(1) Unless a permit has been granted by the department or authorization has been granted by the legislature, it is unlawful:

"(a) To construct, dredge, commence, extend or enlarge an artificial canal, channel, ditch, lagoon, pond, lake or similar waterway where the purpose is ultimate connection with an existing navigable stream, lake or other body of navigable water, or where any part of such artificial waterway is located within 500 feet of the ordinary high water mark of an existing navigable stream, lake or other body of navigable water.

"(b) To connect any natural or artificially constructed waterway, canal, channel, ditch, lagoon,

pond, lake or similar waterway with an existing
body of navigable water, for navigation or any
other purpose."

We would like to think that this legislation was
adopted in part as a response to our call for wise
and forethinking legislation to protect our lakes.[1]
Whether PA 1968, No 7, was a legislative response
to the 1967 *Thompson* v. *Enz* case or whether it was
independently conceived is not of consequence here.
It is sufficient to note that the enterprise of canal
building is now safely under the blanket of legis-
lative and administrative control.   No extensive
citation needs to be given for the proposition that
legislation and statutory regulation are prospective
in their application.   No extensive analysis of au-
thorities is needed to support the proposition that
retroactive application of this statute would consti-
tute the unconstitutional deprivation of vested
private property rights.   The circuit court in this
cause has ordered the issuance of a mandatory
injunction requiring the defendants to fill in their
canals.   It has ordered, without just compensation,
the destruction of private property.   To this un-
conscionable travesty, we cannot subscribe.

We would reverse the trial judge and enter an
order dismissing the complaint.

---

[1] "Michigan needs wise and forethinking legislation, which will pro-
tect our lakes from overcrowding, and the pollution which flows from
immoderate use, so that all of the people of the State, including
riparian cottage owners, will be able to enjoy our great natural
bounty for centuries to come."   *Thompson* v. *Enz* (1967), 379 Mich
667, 699.

Defendants' Proposed Development (bottom) and adjoining canal
Developments (top) on Gun Lake.

Existing canal developments on Gun Lake.

Existing canal developments on Gun Lake.

Existing canal developments on Gun Lake.