**CHEMETRON CORPORATION,**
Plaintiff-Appellee,

v.

**McLOUTH STEEL CORPORATION,**
Defendant-Appellant.

No. 74–1711.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1975.

Decided Aug. 28, 1975.

Rehearing Denied Sept. 17, 1975.

Hamilton Smith, Chicago, Ill., for defendant-appellant.

Joseph DuCoeur, Alan I. Becker, Kirkland & Ellis, Chicago, Ill., for plaintiff-appellee.

Before SPRECHER, TONE and BAUER, Circuit Judges.

TONE, Circuit Judge.

In a trial without a jury of this diversity case governed by Michigan law, plaintiff Chemetron Corporation recovered a judgment for $871,493 as damages for the failure of defendant McLouth Steel Corporation to deliver the quantities of products called for by a supply contract. McLouth appeals. We affirm.

In 1964 the parties entered into a written contract under which Chemetron agreed to purchase from McLouth each month a minimum of 975 tons of liquid oxygen or liquid nitrogen, or both, which the contract calls collectively "liquid

products," and McLouth agreed to make available to Chemetron for purchase each month at least 1950 tons of liquid products as requested by Chemetron. Provisions were included for daily deliveries and the price of the products to be delivered. The contract became effective on April 21, 1965, for a term of five years, and was automatically renewable for an additional five-year term unless one of the parties, not less than one year prior to the expiration of the fifth year of the original term, *i. e.,* by April 21, 1969, notified the other of its desire not to renew.

Neither party gave the required notice, and the contract was therefore automatically renewed. McLouth having failed to furnish liquid products during the renewal term in the amounts called for by the contract, Chemetron brought this action, recovering damages for the period from April 1970 through October 1972 on the basis of the difference between the cost of liquid products obtained by Chemetron from sources other than McLouth for sale in the Detroit area (the relevant market where the products were resold by Chemetron), and the contract price. In addition, for the period from November 1972 through December 1973, Chemetron recovered profits lost by its inability to obtain liquid products which it could have sold in the Detroit market. See Michigan Uniform Commercial Code, M.C.L. §§ 440.2712, 440.2713, 440.2715. Damages for the period January 1974 through March 1975, which plaintiff calculated on the basis of its projections, were denied by the trial court for lack of substantiation. See 381 F.Supp. 245 (N.D.Ill.1974).

McLouth is a steel producer and uses large amounts of liquid oxygen and nitrogen in its steel manufacturing processes. At the time the contract was entered into, it owned four operating liquid products producing plants, which had to be operated continuously for maximum efficiency, and it apparently contemplated meeting its contractual obligations with the excess products produced by these plants. McLouth encountered a great deal of mechanical difficulty in the production of the liquid products, however, with the consequence that in order to maintain a sufficient reserve supply for its own uses it instituted, allegedly with the knowledge, consent, and acquiescence of Chemetron, the policy of making available for sale only an amount of liquid products above a designated minimum in its storage tanks. The present litigation has its roots in this "tank level policy."

Several of the arguments asserted by McLouth in the District Court and ruled upon on that court's opinion are not raised here. See 381 F.Supp. at 253 *et seq.* We turn now to deal with those which are.

## I

McLouth's first argument is that because Chemetron did not request specific quantities of products, damages can be neither calculated nor awarded. It was error, says McLouth, to measure damages by the difference between the quantities Chemetron needed (as distinguished from the quantities it ordered) and the quantities it actually received. McLouth further argues that since the contract was an option contract and not a requirements contract, there was no obligation to furnish any amount of product not actually requested by Chemetron.

The District Court, however, did not hold McLouth responsible for Chemetron's requirements as such, but only for the amounts which McLouth had agreed to furnish. It is true that Chemetron was obligated to request the amounts of liquid products to be delivered (at least amounts above 975 tons per month) and that under ordinary circumstances McLouth would not be obliged to make deliveries of products not ordered. One party to a contract, however, is not required to make repeated requests for performance when the other party has manifested a continuing unwillingness to

meet the terms agreed upon. See *Swift Canadian Co. v. Banet*, 224 F.2d 36, 37 (3d Cir. 1955); *Restatement of the Law of Contracts* § 306. Here Chemetron made phone calls on a daily basis to see how much liquid products would be available for delivery. McLouth's contention that these calls "inquiring" of McLouth's tank level were not sufficient indications that Chemetron desired to purchase liquid products was properly rejected by the District Court in view of the fact, as the court found, that

> "By making its daily telephone call, Chemetron evidenced its preparedness to order some quantity of product, but McLouth, on those days it advised Chemetron that its tanks were below the specified level, having unilaterally adopted and adhered to a policy of refusing to deliver any product on such days, excused Chemetron from the duty of tendering an order for a specific quantity of liquid product." 381 F.Supp. at 253.

In addition, the record is not altogether barren of requests for specific amounts of liquid products above what McLouth was willing to supply—if, indeed, these were even necessary, as McLouth contends—in the form of Chemetron's annual purchase orders in at least three of the years for which damages are sought, and meetings between the companies where such matters were discussed. Moreover, as the District Court observed, "there is no evidence that McLouth at any time responded to Chemetron's numerous complaints by stating that Chemetron had not 'requested' the specific quantities of product it needed, nor has McLouth contended that it would have supplied greater quantities had they been requested." 381 F.Supp. at 253 n.10.

■ McLouth was aware that Chemetron was entitled to purchase the guaranteed amount each month, and, by its continued refusal to honor its contract obligations, McLouth rendered it unnecessary for Chemetron to perform the futile acts of placing daily orders for products both parties knew would not be delivered. Under these circumstances, the fact that Chemetron did not specify the amount it desired each day does not preclude the calculation of recoverable damages based on amounts of products Chemetron needed up to the guaranteed amount.

## II

■ McLouth's next argument is framed solely in terms of the parties' conduct before April 21, 1969, and may be reduced to the contention that in reliance upon Chemetron's consistent waiver of McLouth's performance prior to that date and Chemetron's failure to indicate that it would ever insist upon strict performance, McLouth allowed the contract to be renewed. Therefore, says McLouth, Chemetron is estopped from enforcing the contract. See Michigan Uniform Commercial Code, M.C.L. § 440.2209(5).

In order to establish a waiver and estoppel, McLouth must show that during the period in which it claims the waiver occurred McLouth in fact was in violation of its obligation to furnish liquid products as requested by Chemetron; that Chemetron acquiesced in these violations by its failure to object or that it otherwise acted in a manner inconsistent with the expectation of full performance; and that Chemetron's acquiescence was not an isolated incident but was such as to reasonably induce McLouth to believe that performance was excused. Cf. *Leather Manufacturers' Bank v. Morgan*, 117 U.S. 96, 113, 6 S.Ct. 657, 29 L.Ed. 811 (1886); *Augustus v. New Amsterdam Casualty Co. of Baltimore*, 100 F.2d 581, 587 (7th Cir. 1938), *cert. denied*, 307 U.S. 631, 59 S.Ct. 834, 83 L.Ed. 1514 (1938); *Thompson v. Enz*, 385 Mich. 103, 188 N.W.2d 579, 581 (1971). None of these propositions can be sustained.

The argument that Chemetron acquiesced in breaches by McLouth during

the original contract term, which is an essential part of the waiver defense, was rejected by the District Court because it found that McLouth's performance during the original term was on the whole in substantial compliance with the terms of the contract. The original term commenced on April 21, 1965. Until July of 1967, McLouth supplied Chemetron with an average of 1348 tons of liquid products per month. From August of 1967 to June of 1968 the supply dropped to 856 tons per month, whereupon, at the request of Chemetron's district manager made in a letter calling attention to McLouth's recent breaches of the quantity obligations of the contract, representatives of the parties met to discuss improvements in supply. The meeting ended after McLouth's representative, according to the District Court, "offered assurances that its performance would improve . . . ." A strike at McLouth prevented immediate improvement, but from December of 1968 through April of 1969, McLouth's performance rose to an average of 1283 tons per month.

■ To gauge the adequacy of McLouth's performance during the first four years of the original contract term and thus the correctness of the District Court's finding, it is useful to compare McLouth's deliveries to Chemetron (with which the latter company met its Detroit market requirements) during those periods of the first four years for which no complaints were registered, with Chemetron's sales to its customers (on the basis of which its damages were calculated) for the first nine months of the renewal term, April to December of 1970. Chemetron's sales to its customers for the latter period averaged approximately 1398 tons per month, which is just over 100 tons per month more than the December 1968 to April 1969 deliveries by McLouth and just 50 tons more than the average deliveries by McLouth for the first 27 months of the contract. These comparisons support the District Court's finding that McLouth's performance was ade-

quate to meet Chemetron's needs for the periods from April 1965 to July 1967 and from December 1968 to April 1969, and thus undermine the foundation for McLouth's assertion of waiver. It is true, of course, that in the following three years of the renewal term Chemetron's sales grew to the upper limits of the 1950-ton per month contract maximum, but that is no ground for the claim of waiver or estoppel. Similarly, mere knowledge by Chemetron of McLouth's tank level policy—or even occasional acquiescence for the purposes of accommodation—is no basis for the broad waiver of rights and estoppel McLouth is here asserting, if performance up to the time the option to cancel expired was on the whole satisfactory. Estoppel, "when inferred from silence, must include a change of position and reliance on the silence and an obligation or duty to speak out." *Bivans Corp. v. Community National Bank of Pontiac,* 15 Mich.App. 178, 166 N.W.2d 270, 272 (1968). In view of the facts, as found by the District Court, there was no obligation or duty to speak out.

### III

McLouth maintains finally that under the express terms of the 1964 contract, which was drafted by Chemetron, a condition precedent to the recovery of damages was the cancellation of the contract by the party seeking to recover, and since Chemetron had not cancelled the agreement as of the time of the suit, it cannot maintain this action. The argument rests upon the following paragraph of the contract, which we quote in its entirety:

"Upon default by either party in the performance of any obligation hereunder to be performed by such party, the other party may give notice in writing to the party in default, specifying the amount of any amount due, or the thing or matter in default. Unless such default be cured within 30 days following the giving of such notice,

this Agreement may be cancelled forthwith by written notice at the option of the party serving such notice of default. Such cancellation shall not relieve the party in default from any obligation accrued to the date of such cancellation or from liability and damages for breach of this Agreement. It is agreed that neither the Seller nor the Buyer shall have any right to specific performance of any of the provisions of this Agreement and that *in the event of failure of either party to perform any provision of this Agreement, the only rights of the other party shall be to cancel the Agreement as provided in this paragraph to recover damages for breach of this Agreement.*" (Italics not in original.)

The District Court found that the purpose of the italicized portion of the paragraph was to prevent a multiplicity of suits and to that extent furnished a fair and reasonable limitation. Relying, however, upon the Uniform Commercial Code's restriction on predetermined remedies, see M.C.L. § 440.2719(2),[1] and the official comment, M.C.L.A. § 440.2719 comment 1,[2] the District Court concluded that the paragraph as applied in this situation, in the words of the Code, "failed of its essential purpose," in that it would have deprived Chemetron of the substantial benefit of its bargain by requiring it to forego quantities of liquid products

supplied by McLouth, however insufficient, which were not available from other sources. In sum, said the District Court,

"it would have been commercially unfeasible for Chemetron to cancel its contract with McLouth notwithstanding McLouth's breaches, for Chemetron would obviously have been in an even worse position and less able to serve its customers if it had received no product at all from McLouth . . . ." 381 F.Supp. at 250.

We do not find it necessary to reach the question of whether the paragraph, if construed to foreclose damages absent cancellation, failed of its essential purpose, because we do not so construe it.[3] In interpreting a contract, as in interpreting a statute, a court is not confined to the literal meaning of the words used if a different underlying intent can be discerned. *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir. 1945), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (L. Hand, J.: " . . . it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary . . .") Especially is this true when the words to be construed are combined in such a way that they are unintelligible or so far depart from ordinary verbal patterns as to suggest that a word or words were

1. This reads as follows: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."

2. Comment 1 provides as follows:

"Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

"However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an un-

conscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article."

3. An ambiguity in a contract will ordinarily be resolved against the party who drafted it, in this case Chemetron. But this principle, which perhaps has somewhat less force when both parties are large commercial corporations, should be applied, not to relieve the court of the responsibility of first attempting to determine what the language means, but to resolve the dispute when interpretation fails. See Corbin, *Contracts* § 559 (1960).

inadvertently omitted. In these circumstances, the intended meaning of the words must be determined by examining them in the light of the purpose or object of the provision in which they are found. The context of the italicized clause in the case at bar furnishes the necessary evidence of what was intended by that inartfully drawn clause. The third sentence of the paragraph of which the clause is a part recognizes the existence of "liability and [a right to] damages for breach of this Agreement," which are not affected by cancellation. Presumably, if cancellation "shall not relieve" a party of those obligations, as the language states, those obligations exist when there has been no cancellation. The final sentence of the paragraph is, we think, no more than an unskillful effort to state and then emphasize that neither party has a right to specific performance. It would appear that in the final, italicized clause either the word "and" or the word "or" was inadvertently omitted after the word "paragraph." Otherwise the use of the plural "rights" would be inapt. This view is confirmed by a reading of the paragraph in its entirety, from which it appears that the draftsman's purposes were to provide an opportunity to cure a default, to permit cancellation by the aggrieved party upon written notice if the default is not timely cured, and to preserve other rights arising from breaches that occur before cancellation but to exclude the remedy of specific performance. Requiring cancellation as a condition precedent to an action for damages for breach would not further any of these purposes or any other discernible purpose of the parties. Such a requirement would leave Chemetron with the right to postpone cancellation until the last day of the contract term and collect damages for the breaches to that date, which would not be to McLouth's advantage. McLouth's argument hinges on what would be, if the argument were accepted, at best a mere technicality which Chemetron could have obviated by serving a notice of cancellation and amending its complaint. We

hold that cancellation was not a prerequisite to an action for damages for breach.

Affirmed.