**NORMAN SECURITY SYSTEMS, INC.,**
**an Illinois corporation, Plaintiff,**

v.

**MONITOR DYNAMICS, INC., a**
**California corporation,**
**Defendant.**

**No. 89 C 6561.**

United States District Court,
N.D. Illinois, E.D.

July 5, 1990.

Peter G. Swan, George Tanasijevich, David A. Kaufman, Emalfarb, Swan & Bain, Highland Park, Ill., for plaintiff.

Robert A. Creamer, A. Benjamin Goldgar, Keck, Mahin & Cate, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This action arises out of the alleged breach of express and implied warranties in connection with plaintiff's purchase of computer equipment. Plaintiff Norman Security Systems, Inc. ("Norman") is an Illinois corporation with its principal place of business in Illinois. Defendant Monitor Dynamics, Inc. ("Monitor") is a California corporation with its principal place of business in California. Jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). Monitor contends that the dispute is governed by a General Dealer Agreement ("Dealer Agreement") and has moved to dismiss the case based on a forum selection clause in the Dealer Agreement. For the reasons stated below, Monitor's motion is granted.

### II. FACTS

Norman and Monitor are both corporations which provide commercial security alarm systems. Norman is in the business of installing communications and security systems for its clients. Monitor is in the business of manufacturing, maintaining, and upgrading computer systems and training employees of purchasers.

On May 10, 1985, Norman and Monitor entered into the Dealer Agreement, which named Norman as a general dealer of products manufactured by Monitor. Specifically, Article I of the Dealer Agreement stated:

> The Manufacturer [Monitor] hereby appoints the above Dealer [Norman] as a General Dealer of Products manufactured by the Manufacturer as listed in the price list attached, subject to any occasional revisions made in the price list by the Manufacturer.

The price list containing the products subject to the Dealer Agreement was set forth in Exhibit B to the Dealer Agreement. The Dealer Agreement expressly incorporated Exhibit B through Article XII, Section A, which provided:

> Exhibit B attached defines the Products covered by this agreement. This Product list may be modified by Manufacturer without notice to Dealer when agreeable to both parties or by 30 days written notice to Dealer.[1]

The role of the dealer under the Dealer Agreement was more fully described in Article II, entitled "Relationship." Article II, Section A, specifically provided:

> Dealer agrees to devote it's [sic] best efforts to the performance of it's [sic] primary responsibility, which is distribution of Products being promoted for use, and to provide related services, to include preparation of specifications for architects, owners (end-users), engineers, consultants, general and electrical contractors.

---

1. Although neither side initially submitted a copy of Exhibit B, the Court ordered submission of a copy after the motion to dismiss was briefed. At the time the Dealer Agreement was signed, Monitor contends that Exhibit B consisted of Monitor's price list No. 4. At the time of the sale of the computer equipment at issue in this case, Monitor states that its price list No. 6 was in effect as Exhibit B. Although Norman acknowledges executing the Dealer Agreement, it states that there were no exhibits attached to it at the time of its execution. Norman asserts that it never received Exhibit B to the Dealer Agreement, either prior to or subsequent to its execution. For the purposes of this Opinion, the Court would reach the same result regardless of which version of Exhibit B was in effect and regardless of whether Norman actually reviewed Exhibit B.

(emphasis added). Norman's role as Dealer thus entailed not only the distribution of Products but also the provision of related services.

Article II of the Dealer Agreement also described Monitor's role as Manufacturer. Section C of Article I stated that Monitor was responsible for "developing, manufacturing and marketing high quality products for Security Alarm/Monitoring and Access Control Systems consistent with Manufacturer's [Monitor's] analysis of market needs." Monitor was thus responsible for providing security alarm/monitoring equipment of a sufficient quality.

Finally, the Dealer Agreement contained a forum selection clause which provided that any disputes between the parties would be settled in the state courts of California. Specifically, the Dealer Agreement stated:

> This agreement will be governed by California Law and any dispute between the parties shall be heard in the Courts of San Bernardino County, State of California.

On March 18, 1986, Norman purchased certain computer equipment from Monitor which was evidenced by Purchase Order No. N 7696 (the "Order"). Norman states that it made the purchases in that Order pursuant to verbal representations, purchases in that Order pursuant to verbal representations, promotional literature and a written bid provided by Monitor's representatives. The equipment purchased consisted of a central station computer and certain customer premises control equipment manufactured by Monitor. The customer premises control equipment was designed to be installed on the premises of Norman's customers for the purpose of monitoring the burglar alarms of those customers and providing a link to the central station computer. The central station computer was designed to be installed on Norman's premises to monitor the customer premises control equipment.

During the ensuing two and one-half years, Norman contends that the computer equipment purchased pursuant to the Order failed to perform as promised. On August 29, 1989, Norman filed this action seeking damages pursuant to Sections 2–313, 2–314 and 2–315 of the Uniform Commercial Code (the "UCC").[2] In Count I of its complaint, Norman claims that Monitor is liable for breach of an implied warranty of fitness for a particular purpose pursuant to UCC Section 2–315. In Count II, Norman claims that Monitor is liable for breach of express warranties pursuant to UCC Section 2–313. In Count III, Norman contends that Monitor is liable for breach of an implied warranty of merchantability pursuant to UCC Section 2–314.

Monitor has moved to dismiss the complaint, arguing that the purchase of the computer equipment in question is governed by the terms of the Dealer Agreement and that the Dealer Agreement was a freely negotiated contract which required that all disputes be settled in the state courts of California. Monitor concludes that the Court should dismiss this action pursuant to the forum selection clause of the Dealer Agreement.

Norman, on the other hand, argues that the dispute is governed solely by the terms of the Order. Norman contends that the Dealer Agreement was only intended to govern the relationship and obligations of the parties in their roles as manufacturer and dealer, and that Norman purchased the equipment in question for its own use. Norman reasons that because the computer equipment was purchased for its own use, Norman was not acting as a dealer within the terms of the Dealer Agreement and the Dealer Agreement therefore does not apply to the transaction. In the alternative, Norman argues that even if the forum selection clause in the Dealer Agreement is valid, the Court should still deny enforcement of the clause. Norman states that the enforcement of the clause would be overly inconvenient to Norman and would deny

---

**2.** Norman's complaint cites the Uniform Commercial Code (the "UCC") as its authority. It is unclear whether Norman relies on the California or the Illinois codification of the UCC. For the purposes of this decision, the Court need not determine which state's codification applies.

Norman an adequate chance of presenting its claim.

## III. APPLICABILITY OF DEALER AGREEMENT

■ Norman argues that the Dealer Agreement is inapplicable to the present dispute because Norman was not acting as a dealer when it purchased the computer equipment. As Norman points out, a "Dealer" is one who "buys to sell, not one who buys to keep, or makes to sell." *Black's Law Dictionary* 487 (4th ed. 1968). Norman reasons that because it purchased the computer equipment for its own use, it was not acting as a dealer in this transaction and the Dealer Agreement does not govern the transaction.

■ In interpreting a contract, a court is not confined to the literal meaning of words used if a different underlying intent can be discerned. *Chemertron Corp. v. McLouth Steel Corp.*, 522 F.2d 469, 472 (7th Cir.1975). *See also Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945) (L. Hand, J.) ("it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary"). A complete reading of the Dealer Agreement reveals that the dealer relationship contemplated by the parties was more expansive than the one described by Norman. Article III of the Dealer Agreement, entitled "Relationship," more completely described the relationship contemplated by the parties. Section A defined the primary responsibility of the Dealer as the "distribution of Products being promoted for use, and ... provi[sion] of related services...." As shown below, this lawsuit concerns both of Norman's roles as a "Dealer;" Norman's action centers on its ability to provide related services and involves "Products being promoted for use."

Norman cites the section of the Dealer Agreement entitled "Purpose of Agreement" which stated that the Dealer's "primary responsibility [is] to promote the use of the Products within a geographical area...." Norman reasons that the Dealer Agreement was only intended to govern transactions in which Norman acted as Monitor's salesman. The Court finds this reasoning unpersuasive.

Part of Norman's primary responsibility, as defined in Section A, is to "provide related services." Norman's entire cause of action centers on its inability to provide such related services because of the quality of the products supplied by Monitor. Norman's complaint alleges that it was unable to effectively monitor the alarms of its clients because of defects in the equipment provided by Monitor. If the monitoring of security alarms was not a central feature of the services to be provided pursuant to the Dealer Agreement, it was certainly a "related service" contemplated by the parties. Moreover, pursuant to Section C of Article II, Monitor's primary responsibility included the manufacture of high quality products for security alarm/monitoring and access control systems. Norman's complaint in effect alleged a breach of this responsibility. Thus both parties' conduct as described in the complaint comes within the scope of the Dealer Agreement.

Norman also relies on the preface of the Dealer Agreement, which provided that the Dealer Agreement "comprises the entire AGREEMENT" between the parties. Norman reasons that to give this clause effect and for the Order to have any effect, the Order must stand independently of the Dealer Agreement. Therefore, Norman argues, the purchases subject to the Order were not made pursuant to Norman's role as a "Dealer" under the Dealer Agreement. The language of the Dealer Agreement, however, reveals that the parties fully intended the terms of the Dealer Agreement to operate in conjunction with the purchase orders. Article II, Section D of the Dealer Agreement stated:

> The Dealer agrees that none of the provisions in it's [sic] purchase orders shall amend or modify the terms and conditions of purchase (under separate cover), all of which terms and conditions are agreed to apply to any sale by Manufacturer of Products to Dealers.

Further, the Dealer Agreement specifically provided that its terms and conditions could

not be modified by any subsequent purchase order. Thus, the Dealer Agreement made clear that its terms must be read together with any subsequent purchase order.

■ Finally, in Section D of Article II, the parties stated that "the terms and conditions [of the Dealer Agreement] are agreed to apply to *any* sale by Manufacturer of *Products* to Dealers." (Emphases added.) The term Products was defined in the Dealer Agreement as those products which appear in Exhibit B.[3]

Although the parties did not raise this issue, the Court has also examined the possibility that Norman was not acting as a Dealer because the products subject to the Order were not of the type found in Exhibit B. However, a review of both versions of Exhibit B indicates that the equipment purchased pursuant to the Order was intended to be governed by the Dealer Agreement. The equipment Norman purchased pursuant to the Order was the type of equipment maintained on the price lists.[4]

For all of these reasons, the Court finds that the products purchased pursuant to the Order were intended by the parties to be governed by the terms of the Dealer Agreement. As a result, the transaction is subject to the forum selection clause found in the Dealer Agreement.

## IV. VALIDITY OF THE FORUM SELECTION CLAUSE

■ In the alternative, Norman argues that even if the forum selection clause is applicable to this dispute, the Court should refuse to enforce it. Norman contends that forcing it to pursue its claim in California would be so manifestly and gravely inconvenient to Norman that it would be effectively deprived of a meaningful day in court.

■ In *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972), the Supreme Court held that forum selection clauses are prima facie valid and should be enforced unless the resisting party can show that enforcement would be unreasonable under the circumstances. The Court identified certain circumstances where a forum selection clause should be set aside. For example, such a clause should not be enforced where it is procured by fraud, undue influence or overweening bargaining power. 407 U.S. at 12, 92 S.Ct. at 1914. In addition, a forum selection clause should not be enforced where enforcement would contravene a strong public policy of the forum in which the suit is brought or where "the chosen forum is *seriously* inconvenient for the trial of the action." 407 U.S. at 15, 16, 92 S.Ct. at 1916 (emphasis in original).

Since *M/S Bremen*, enforcement of forum selection clauses has been the rule rather than the exception. *Friedman v. World Transportation, Inc.*, 636 F.Supp. 685, 689 (N.D.Ill.1986). Although *M/S Bremen* was an admiralty case involving international parties, federal courts have consistently applied its analysis to cases involving only domestic parties and causes of action other than admiralty. *Friedman*, 636 F.Supp. at 689.

Norman does not argue that the forum selection clause was procured through fraud, undue influence or overweening bargaining power, nor does Norman argue that the clause would contravene a strong public policy of the forum state. Rather,

3. Although Norman contends it never saw an Exhibit B, it is an established principle of contract law that parties may incorporate other writings by reference into a written contract. *Guerini Stone Co. v. P.J. Carlin Construction Co.*, 240 U.S. 264, 278, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916); *Rehart v. Clark*, 448 F.2d 170, 174 (9th Cir.1971). "[A]n explicit incorporation of another document into a signed contract binds the signing parties, according to the clear import of the agreement, even where they have not seen the incorporated document." *In the Matter of Dahlberg*, 21 B.R. 730, 731 (Bankr.W.D.Mo.

1982). Where Norman was willing to sign the Dealer Agreement explicitly incorporating Exhibit B, allegedly without seeing it, this Court cannot relieve Norman of its clear and express consent.

4. The Court also notes that although Norman contends that the Dealer Agreement is inapplicable to the purchase of equipment in question, Norman has failed to suggest a single product to which the Dealer Agreement would in fact apply.

Norman argues that the chosen forum for the action, California, is seriously inconvenient. Norman cites three bases for this inconvenience: the necessity of customer witnesses, the necessity for the trier of fact to view the computer system, and the costs involved in transporting the computer equipment and witnesses to California.

First, Norman asserts that, although each party may have an equal number of employee witnesses to present at trial, Norman has the added burden of presenting the testimony of customer witnesses. Norman contends that the "only" effective way of describing the problems experienced by its customers would be to present live testimony. Further, Norman contends that it is "highly unlikely that these witnesses would voluntarily appear in a California court." However, the mere loss of live testimony does not ordinarily constitute such "serious" inconvenience as would warrant setting aside a freely bargained for forum selection clause. *See Walker v. Carnival Cruise Lines, Inc.*, No. 87 C 115 (N.D.Ill. Dec. 12, 1986). Although the testimony may not be as effective, the testimony of customers can be presented through depositions, perhaps even video depositions. Moreover, the Court cannot rely on Norman's conclusory statements that it is "highly unlikely" that these witnesses would refuse to voluntarily appear.

Norman also reasons that the trier of fact must view the computer system and perhaps even visit Norman's offices. In the only case cited by Norman in which a forum selection clause was set aside, *General Engineering Corp. v. Martin Marietta Alumina, Inc.*, Civil No. 1984/227 (D.V.I. Feb. 13, 1986), the court did rely on the necessity of viewing the site in its decision to set aside the clause. *Martin Marietta*, however, involved space limitations on a construction site. The fact situation which created the specific need to view the site in *Martin Marietta* does not exist in the present case. It is doubtful that an on-site inspection of computer equipment would substantially assist the trier of fact's decision-making process. Here, Norman has failed to demonstrate why such evidence cannot be effectively presented through the testimony of witnesses and the use of photographs or other exhibits.

Finally, Norman argues that the costs involved in transporting the computer equipment and witnesses to California would be prohibitive. Norman further states that it was not specifically compensated by its Dealer Agreement for any inconvenience suffered as a result of being forced to litigate in California. However, Norman has presented no evidence from which the Court can conclude that the forum selection clause was not an integral part of the Dealer Agreement. The Court fails to understand why there should be any independent consideration for the clause. In agreeing to the forum selection clause, Norman could not have been unaware that some additional costs would be associated with litigating a dispute in California. Furthermore, Article VII, Section B(6) of the Dealer Agreement specifically provided that:

> In the event a dispute should arise between the parties hereto which results in litigation, the prevailing party in any such litigation shall be entitled to reasonable attorney's fees and costs as determined by the Courts.

Should Norman prevail in the litigation, it will apparently be entitled to reimbursement for its reasonable attorney's fees and costs.

For these reasons, the Court finds that Norman has not carried the "heavy burden," *see M/S Bremen*, 407 U.S. at 17, 92 S.Ct. at 1917, of showing that California is a "seriously inconvenient" forum.

## V. CONCLUSION

Because the Court finds that the Dealer Agreement was intended to govern the purchase of equipment in question and because Norman has failed to show that enforcement of the forum selection clause would be seriously inconvenient, Monitor's motion to dismiss is granted.